

# IN THE
# TENTH COURT OF APPEALS

## No. 10-08-00189-CR

# EX PARTE ANTHONY CHARLES GRAVES,

### From the 21st District Court
### Burleson County, Texas
### Trial Court No. 11136-B

## DISSENTING OPINION

Anthony Graves was deprived of a possible acquittal before the first jury when, during his capital murder trial, the State did not disclose to the defense the exculpatory statements of its "star witness," Robert Carter, who had told the district attorney the night before his inconsistent trial testimony that he alone had committed the murders, along with his statement implicating his wife Theresa "Cookie" Carter in the murders. To avoid a possible acquittal if the jury heard the exculpatory statements, the district attorney also intentionally—"more egregiously," as the Fifth Circuit put it—elicited Carter's false and misleading testimony that, except in his grand jury testimony, he had always implicated Graves in the murders. The district attorney also elicited the false and misleading testimony of Ranger Coffman that all of Carter's statements except his

grand jury testimony had implicated Graves. Graves was found guilty of capital murder and sentenced to death. His conviction was affirmed. *Graves v. State*, No. 72,042 (Tex. Crim. App. April 23, 1997).

Graves and his postconviction habeas attorneys did not learn of Carter's exculpatory statements to the district attorney for almost four years. After an evidentiary hearing, the United States Fifth Circuit Court of Appeals found a *Brady* due-process violation, holding that the State withheld exculpatory and material evidence. *Graves v. Dretke*, 442 F.3d 334 (5th Cir. 2006), *cert. denied*, 127 S.Ct. 374 (2006).

*Oregon v. Kennedy* provides a "narrow exception" to the general rule that there is no jeopardy bar to a retrial after a defense-requested mistrial: A defense-requested mistrial bars retrial only when the prosecutorial "conduct giving rise to the successful motion for a mistrial was intended to provoke [or goad] the defendant into moving for a mistrial." *Oregon v. Kennedy*, 456 U.S. 667, 673, 676, 102 S.Ct. 2083, 2088-90, 72 L.Ed.2d 416 (1982). I believe that a similar narrow exception should apply in those extremely rare cases where the State intentionally withholds *Brady* evidence and intentionally elicits false testimony relevant to that evidence with the intent to avoid the possibility of an acquittal, and the conviction is later reversed or set aside for that *Brady* violation. Because I believe that the Double Jeopardy Clause bars retrial under the established facts of this case, I respectfully dissent.

### Background and Evidence

The State is retrying Graves for capital murder and is seeking the death penalty, and Graves's appeal of the trial court's denial of his habeas petition presents an

important matter of first impression post-*Ex parte Masonheimer*, 220 S.W.3d 494 (Tex. Crim. App. 2007). The majority opinion inexplicably omits a discussion of the evidence and the factual determinations that the federal court made in the collateral review of Graves's conviction, which is res judicata on the *Brady* issues resolved by the Fifth Circuit and that form the basis for Graves's habeas petition.[1] I will thus quote at length from the Fifth Circuit's opinion:

> Anthony Graves was convicted of capital murder and sentenced to death in 1994 for the capital offense of murdering six people in the same transaction. The procedural history of Graves' conviction, post-conviction appeals and writ petitions is presented in our previous opinions addressing Graves' application for certificate of appealability. This court originally granted COA only on Graves' *Brady* claim that the state failed to disclose to Graves that key prosecution witness and Graves' co-defendant Robert Earl Carter informed the district attorney that Graves was not involved in the charged crime on the day before he testified to the contrary at Graves' trial. *Graves v. Cockrell*, 351 F.3d 143 (5th Cir. 2003) ("*Graves I*"). On rehearing, this court modified its order and also granted COA on Graves' claim that the state's failure to disclose Carter's alleged statement implicating his wife in the crimes violated Graves' rights under *Brady*. *Graves v. Cockrell*, 351 F.3d 156 (5th Cir. 2003) ("*Graves II*"). The case was remanded to the district court
>
>> for an evidentiary hearing to determine: (1) the substance of the alleged statement described above, along with Carter's statement allegedly exonerating Graves; (2) whether Graves

---

[1] The majority opinion's view that no record evidence supports Graves's arguments is incorrect. In addition to our proper reliance on the legal and factual issues decided by the Fifth Circuit because they are res judicata (and thus cannot be relitigated by the State), the record excerpts from Graves's first trial (which we have made a part of the record in this appeal at the request of both Graves and the State) are properly before us; I believe that our review of the trial court's ruling on the double jeopardy claim in Graves's habeas petition is de novo because that issue is a question of law. The resolution of the ultimate questions turns on an application of legal standards absent any credibility questions, which is the case given the federal court's resolution of the relevant facts underlying Graves's petition's double-jeopardy claim. *See State v. Webb*, 244 S.W.3d 543, 547 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *see also State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006) ("The appellate court then reviews the trial court's legal ruling de novo unless the supported-by-the-record implied fact findings are also dispositive of the legal ruling.") (cited in *Masonheimer*, 220 S.W.3d at 506 n.14); *Oles v. State*, 993 S.W.2d 103, 106 (Tex. Crim. App. 1999) ("However, the instant case presents us with a question of law based on undisputed facts, thus we apply de novo review.").

was aware of these statements or exercised due diligence to discover these statements; (3) whether the state's failure to disclose these statements was material to Graves' defense under Brady; and (4) for a determination of whether Graves is entitled to relief on these claims.

*Graves II,* 351 F.3d at 159. COA was denied on all other claims.

On remand, an evidentiary hearing was held before Magistrate Judge Froeschner who, after reviewing briefly the facts of the crime, made the following factual findings in his report and recommendation.

Carter's wife, Cookie, was also indicted for the offense of capital murder. Attorneys Calvin Garvie and Lydia Clay-Jackson, who defended Graves at trial, believed this indictment to be a sham based on false evidence presented to the grand jury and obtained only in order to pressure Carter to testify against Graves. Evidentiary Hearing Transcript ("EHT") at 129, 168. Nevertheless, Burleson County District Attorney Charles Sebesta, who prosecuted Graves, insisted that the State believed from early on that Cookie participated in the killings and that all evidence pointed to the involvement of three people. Id. at 57, 98. Indeed, the State's theory from the beginning of the trial was that at least three people had acted together in the murders. Id. at 174.[1] Texas Ranger Coffman testified at trial that his investigation showed "at least three and possibly four" perpetrators were in the Davis home when the murders occurred. Trial Transcript ("TT"), vol. 38 at 3728.

[1] This theory appears to be based on the number of victims, six, and the number of murder weapons, three (a gun, knife and hammer), not on any specific physical evidence.

Prior to the beginning of Graves' trial, the District Attorney's office had been in negotiations with Carter and his appellate attorney for Carter's testimony against Graves. According to Sebesta, no final agreement on the terms had been reached prior to Carter's arrival in Brazoria County for Graves' trial, although any final plan was to involve the use of a polygraph exam before he testified. Id. at 51. The early discussions also involved Carter's condition that the State would not ask him questions about his wife's role in the murders. Id. at 54.

Sebesta met with Carter in the early evening of October 21, 1994.[2] According to Sebesta, Carter almost immediately claimed, "I

did it all myself, Mr. Sebesta. I did it all myself." Id. at 60. When Sebesta stated that he knew that was not true because of the number of weapons used, Carter quickly changed his story and claimed that he committed the murders with Graves and a third man called "Red." Id. at 61, 94, 95. Carter had earlier implicated a person named "Red" during the murder investigation, and the State believed that Theresa Carter may have been known by that nickname. Petitioner's Ex. 9 at 24. When Sebesta proposed that "Red" was actually Cookie, Carter denied it and agreed to take a polygraph exam. EHT at 95.

> 2 This was the evening of the second day of the guilt/innocence phase of the trial.

Since the polygraph examiner had been out sick that day, he was called to come in to administer the exam. Id. at 96. The report states that Carter signed a polygraph release statement, had the exam explained to him, and then changed his story once more before the exam was given by stating that he had killed the Davis family with Graves but without "Red." Petitioner's Ex. 9 at tab 4. The interviewer then posed the following questions to Carter: (1) "[W]as your wife, Theresa, with you [at the time of the murders]?" and (2) "[W]hen you refer to 'Red' in your statement, are you talking about your wife, Theresa?" Id. Carter answered "no" to both questions. The polygraph examiner concluded that Carter was not being truthful in either response. Id. When the polygraph results were explained to him, Carter once more changed his story. He now admitted that Cookie was involved in the murders with himself and Graves. He also stated that he had invented the character "Red" but later admitted that Cookie was sometimes called "Red." Id. When Sebesta asked him if Theresa had used the hammer in the murders, Carter answered "yes." EHT at 96.

In addition to the tentative deal to forego questions about Cookie in exchange for testifying against Graves, the State had also been working on a broader agreement that would allow Carter to accept a life sentence rather than death if his case were reversed in appeal. This required Carter to testify against both Graves and Cookie. Id. at 67. By the time the October 21 meeting concluded, he had tentatively assented to do so, though no final agreement was reached. Id. at 62, 103, 105. The next morning, however, Carter refused to testify against Cookie and reverted to the initial terms already worked out with the State. Both Carter and Sebesta then

accepted the tentative agreement as the final deal for his testimony.

At the evidentiary hearing, Garvie denied that he knew before, or at any time during, trial that Carter had told Sebesta he killed the Davis family himself. Sebesta testified that he mentioned the statement to Garvie on the morning Carter testified. Id. at 149. The Court accepts Garvie's version of this event based on his credibility as a witness and as being consistent with his vigorous defense of Graves at trial. Sebesta did reveal part of the polygraph results on the morning of October 22 when he told the trial judge: "last night at 8:30 Mr. Carter took a polygraph[,] and the basic question involved his wife, Theresa. It shows deception on that polygraph examination. But, obviously, we can't go into polygraphs here, but I think counsel is certainly entitled to know that." TT, vol. 35 at 3360. Garvie asked no questions about what the polygraph involved. Garvie's co-counsel testified that it did not occur to the defense to inquire into Sebesta's statement because they believed the indictment against Cookie was unfounded. EHT at 134. Nor did it fit the defense's theory of the case. According to Ms. Clay-Jackson, the defense thought that at least two people were involved in the killings but that Cookie was not one of them. Id. at 122. The State then called Carter to the stand and revealed to the jury that he was testifying in exchange for an agreement that questions would not be asked about his wife. TT, vol. 35 at 3429.

Graves' habeas attorneys appear to have first learned of Carter's statement, "I did it all myself," in 1998. On June 19, 1998, Graves' former attorney took a deposition from Carter in which he claimed to have acted alone. *Ex parte Graves*, No. 40,812-01 at 97 ff. That statement was excluded from the record by the state court as inherently unreliable because Graves' attorney failed to notify the State, as required by law, in order to allow cross-examination. Carter again recanted his trial testimony in a May 18, 2000, deposition attended by both Sebesta and Graves' current counsel. Sebesta later appeared on the Geraldo Rivera show *Deadly Justice* on September 3, 2000, and repeated Carter's self-confession. Sebesta stated: "yes, and at that point he [Carter] did tell us, 'Oh, I did it myself. I did it.' He did tell us that." Petitioner's Ex. 1.

The magistrate judge found that Sebesta did not reveal Carter's statement that he committed the murders alone to the defense and that because Graves' attorneys had no way of knowing about the statement, they had no reason to exercise due diligence to discover it.

Graves bases his *Brady* claims on two suppressed statements the state admits Carter made on the evening before Carter testified at Graves' trial—first, that Carter committed the crimes alone, and second, that Carter's wife Cookie was an active participant in the murders.

No one disputes that Carter was the state's star witness. Graves made no self-incriminating statements to the police before his trial. He testified before the grand jury denying all involvement and explaining his whereabouts on the night of the murders. The only potentially incriminating statements allegedly made by Graves were heard over the jailhouse intercom system. The persons reporting these statements were effectively cross-examined on the reliability of the intercom system, their ability to recognize Graves' voice since his cell could not be seen from their listening post, and their failure to make contemporaneous reports of the comments.

The only physical evidence tied to Graves that was marginally linked to the crimes was a switchblade knife brought forward by Graves' former boss that was identical to one that he had given to Graves as a gift. The medical examiner testified that the knife wounds on the victims were consistent with that knife *or* a knife with a similar blade. Graves' medical expert testified that a wide range of knives with similar dimensions to the switchblade were also consistent with the victims' wounds including holes in skull caps of some of the victims. None of the murder weapons were recovered. Thus, it is obvious from the record that the state relied on Carter's testimony to achieve Graves' conviction. It is in this context that the materiality of the suppressed statements must be examined.

*a. The suppressed statement by Carter that he committed the crimes alone.*

The district court found that Graves was not aware of Carter's statement that he committed the crime by himself but found that the statement was not material.[4] Our original assessment of this statement was that it "was extremely favorable to Graves and would have provided powerful ammunition for counsel to use in cross-examining Carter." *Graves I,* 351 F.3d at 155. Although we did not have a completely accurate version of the events surrounding the statement at the time of our original opinion, under the facts as found by the district court on remand we reach the same conclusion.

[4] District Attorney Sebesta contradicted Graves' counsel and testified at the habeas hearing that he told Graves' defense

counsel Garvie of this statement outside the courtroom the morning after Carter made the statement. The district court did not find Sebesta credible on this point.

Carter's statement that he acted alone in committing the murders is particularly significant because it was the first statement Carter made that implicated himself without also implicating Graves. The only other statement Carter made pre-trial exculpating Graves was before the grand jury. In that statement Carter claimed that neither he nor Graves was involved in the murders. At trial the state recognized that its case depended on the credibility of Carter and the prosecutor emphasized Carter's consistency in his various statements in naming Graves as an accomplice. In Carter's grand jury testimony Carter testified that he only gave Graves' name to investigators because he was coerced.[5] The prosecutor explained Carter's grand jury testimony by pointing out that Carter's testimony, that neither he nor Graves was involved, followed threats by Graves.[6] Carter's suppressed mid-trial statement exculpating Graves was not coerced and would have undercut the state's argument that Carter did not implicate Graves before the grand jury because Graves threatened him. The state's case depended on the jury accepting Carter's testimony. Given the number of inconsistent statements Carter had given, the state faced a difficult job of persuading the jury that Carter was a credible witness, even without the suppressed statement. Had the defense been able to cross-examine Carter on the suppressed statement, this may well have swayed one or more jurors to reject Carter's trial version of the events.

[5] Before the grand jury, Carter testified as follows:

I couldn't harm anybody, but during interrogation, between seven and eight hours or so, I was told that they got enough evidence on me to give me the death penalty. I know I haven't done anything wrong. I know I wasn't in Somerville like they say I was. They say they know that I didn't do it, but I know who did it and they wanted me to give a name so I tried to tell them that I don't know anybody.

And by being pressured, being hurt, confused and didn't know what to think, I said Anthony Graves off the top of my head.

[6] After eliciting testimony from Carter that Graves had threatened him physically and verbally while they were

housed in the Burleson County Jail, the following exchange took place between Sebesta and Carter as Carter testified at Graves' trial:

> Sebesta: What did you do when you went to the Burleson County grand jury?
> Carter: Lied.
> Sebesta: Why did you lie?
> Carter: Because I was afraid.
> Sebesta: How did you go about lying to them?
> Carter: Saying that I made up the whole story, that it didn't take place.

Perhaps even more egregious than District Attorney Sebesta's failure to disclose Carter's most recent statement is his deliberate trial tactic of eliciting testimony from Carter and the chief investigating officer, Ranger Coffman, that the D.A. knew was false and designed affirmatively to lead the jury to believe that Carter made no additional statement tending to exculpate Graves. District Attorney Sebesta asked Carter to confirm that, with the exception of his grand jury testimony where he denied everything, he had always implicated Graves as being with him in committing the murders. Carter answered in the affirmative. Sebesta also asked Ranger Coffman, after Carter testified, to confirm that all of Carter's statements except the grand jury testimony implicated Graves. Sebesta also confirmed through Ranger Coffman that he understood his obligation to bring to the prosecutor's attention any evidence favorable to the defense. Although there is no factual finding regarding whether Ranger Coffman knew of Carter's statement that he committed the crimes alone, Sebesta clearly knew of the statement and used Ranger Coffman as well as Carter to present a picture of Carter's consistency in naming Graves that Sebesta clearly knew was false.

> *b. The suppressed statement by Carter that Cookie was an active participant in the murders.*

The state stipulated that Carter told Sebesta, "Yes, Cookie was there; yes Cookie had the hammer." This statement was also made the night before Carter testified in Graves' trial. Sebesta did not inform Graves' counsel of this statement. He did disclose to the court and counsel that Carter had failed a polygraph regarding Cookie's involvement.[7] The district court found that after hearing about the polygraph, Graves did not exercise due diligence to discover the substance of the statement. The district court also found that the statement was not exculpatory because it did not exculpate Graves.

Rather it was consistent with the state's three person theory, that the crime was committed by Carter, Cookie and Graves. We disagree on all points.

> [7] Sebesta made the following statement: "There is something I need to put on the record from a[sic] exculpatory standpoint. It cannot be used, but last night at 8:30 Mr. Carter took a polygraph and the basic question involved his wife, Theresa. It shows deception on that polygraph examination. But, obviously, we can't go into polygraphs here, but I think Counsel is certainly entitled to know that."

*Due Diligence?*

The district court found that Sebesta's in-court statement "was not so vague in light of the surrounding circumstances that they should not have inquired about it further." However, Sebesta's statement did not reveal or even imply that Carter gave a statement affirmatively naming Cookie as an active participant in the murders. The defense had specifically requested any information related to any party, other than Graves and Carter, who the state alleged was involved in the crime. They had no evidence that Cookie was involved in the crime and viewed her indictment as a tool to get Carter to testify. This assumption was confirmed by Sebesta's discovery response. Sebesta's response to the defense's discovery request was that "there were some names that were given" to the State, but that "[t]hey're not necessarily parties to the crime but they are people who may have—may possibly have some information on those." Sebesta's questioning of Carter at Graves' trial about Cookie's involvement also reinforced defense counsel's belief that she was involved, if at all, after the crimes were committed. In Sebesta's questioning of Carter, Sebesta asked Carter to confirm their agreement that he would not ask any questions about his wife and to confirm that he had "not asked [him] any question about what she may or may not know about it." When the defense cross-examined Carter, they asked about Cookie's whereabouts and who possessed the hammer. Carter's testimony was obviously different than the statement he gave Sebesta the previous night that Cookie was there and Cookie had the hammer.

We disagree with the district court's conclusion that the defense did not exercise due diligence to discover the statement regarding Cookie's involvement in the crimes. Graves' counsel had specifically requested the information disclosed in the statement. We view Sebesta's statement regarding the polygraph, his discovery responses and questioning of Carter as misleading and a deliberate attempt to avoid

disclosure of evidence of Cookie's direct involvement. At a minimum, Sebesta's minimal disclosure was insufficient to put the defense on notice to inquire further, particularly in light of the state's discovery disclosure.

*Exculpatory?*

Graves next challenges the district court's conclusion that the statement regarding Cookie's involvement is not exculpatory because the statement implicated Graves as well.[ ] The district court found that the statement is not exculpatory because it implicated Graves based on the government's three person theory. It also found that the statement would have contradicted the testimony of one of Graves' witnesses, Tametra Ray, who testified that Cookie was home at the time of the murders. Again, we disagree.

The statement regarding Cookie's direct involvement in the crime is exculpatory for several reasons. First, each party's theory about how many people were actively involved in the crime is just a theory based on the number of people killed and the number of weapons used. The defense had submitted that two people were probably involved and had specifically requested any information related to any party, other than Graves and Carter, who the state alleged was involved in the crime. Although Cookie had been indicted, the defense viewed the indictment as a tool to pressure Carter into testifying. As we noted in our prior opinion, "if Graves had been furnished with Carter's statement, it could have provided him with an argument that those two persons were Carter and his wife rather than Carter and Graves." *Graves II*, 351 F.3d at 159. Also, Carter's statement, placing Cookie directly at the scene and actively involved in the murders, puts his deal with the state to testify only on the condition that he not be questioned about Cookie's involvement in a different light. It provides a stronger argument to Graves that Carter was lying about Graves' involvement to save Cookie.

The district court did not reach the issue of materiality of the statement. That issue will be discussed in the following section regarding the effect of the two statements considered together.

*c. The statements considered together?*

The sole remaining issue under Graves' *Brady* claim is whether, considered together, the two statements—Carter's claim that he did it himself and Carter's statement directly implicating his wife Cookie in the murders—are material. We conclude that they are. If both statements had

been timely furnished to Graves, he could have persuasively argued that (1) the murders were committed by Carter alone or by Carter and Cookie; and (2) Carter's plan from the beginning was to exonerate Cookie, but a story that he acted alone was not believable, so he implicated Graves so the prosecution would accept his story and decline to prosecute Cookie.

The state argues that the combined statements are not material because they are inconsistent and could have been damaging to Graves if the jury believed that the most credible account of the murders involved three killers, Carter, Cookie and Graves. The problem with the state's argument is that it analyzes the significance of the suppressed evidence against a backdrop of how the defense presented its case at trial without the suppressed statements. If the two statements had been revealed, the defense's approach could have been much different (as set forth above) and probably highly effective.

. . .

Because the state suppressed two statements of Carter, its most important witness that were inconsistent with Carter's trial testimony, and then presented false, misleading testimony at trial that was inconsistent with the suppressed facts, we have no trouble concluding that the suppressed statements are material. Carter made several inconsistent statements throughout the investigation and pre-trial period. In some he denied all involvement, in some he implicated himself and Graves, and then, just before he testified against Graves, he gave the statements at issue in this appeal accepting full responsibility as the sole murderer and another statement placing his wife Cookie as an active participant in the murders. If the defense had known about the statement placing Cookie at the scene and given Carter's continuing condition that he would only testify if he were not asked about Cookie's involvement, the defense could have explained every statement implicating Graves as a means of protecting Cookie. As indicated above, these statements are particularly important in this case because Graves' conviction rests almost entirely on Carter's testimony and there is no direct evidence linking him with Carter or with the murder scene other than Carter's testimony. In addition, Carter's statement that he committed the crimes alone is important as the only statement he made exculpating Graves while implicating himself. The combination of these facts leads us to conclude "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles,* 514 U.S. at 435, 115 S.Ct. 1555. Stated differently, disclosure of the statements "would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." *Id.* at 441, 115 S.Ct. 1555.

> For the foregoing reasons, the judgment of the District Court is reversed and the case is remanded with instructions to grant the writ of habeas corpus unless the state proceeds to retry petitioner within a reasonable time.

*Graves*, 442 F.3d at 336-45 (footnote 8 omitted).

### Extension of *Kennedy* an Open Question

*Masonheimer* held that the *Oregon v. Kennedy* standard barred retrial "under the unique circumstances of that case" because the State had intentionally failed to disclose exculpatory evidence with the specific intent to avoid the possibility of an acquittal. *Masonheimer*, 220 S.W.3d at 507. The *Masonheimer* court reasoned that "in a case like this, a defendant suffers the same harm as when the State intentionally 'goads' or provokes the defendant into moving for a mistrial." *Id.* *Masonheimer* did not involve a reversal on appeal, and its ruling was limited "to retrial after a defense-requested mistrial." *Masonheimer*, 220 S.W.3d at 508 n.19. "This rule *arguably* would not apply to a retrial after a reversal of a defendant's conviction on appeal because, in such a situation, the defendant's valued right to have guilt-innocence determined by the first trier of fact has not been compromised." *Id.* (emphasis added).

In *Bauder*, the Court of Criminal Appeals interpreted the Double Jeopardy provision of the Texas Constitution more expansively to cover "reckless" conduct, holding that retrial would also be barred "when the prosecutor was aware but consciously disregarded the risk that an objectionable event for which he was responsible would require a mistrial at the defendant's request." *Bauder v. State,* 921

S.W.2d 696, 699 (Tex. Crim. App. 1996).[2]  In *Ex parte Peterson*, the Court of Criminal Appeals reaffirmed and clarified the standard enunciated in *Bauder*.  *Ex parte Peterson*, 117 S.W.3d 804 (Tex. Crim. App. 2003).

However, the Court of Criminal Appeals recently overruled *Bauder* and *Peterson* in *Ex parte Lewis*, 219 S.W.3d 335 (Tex. Crim. App. 2007).  The court held that 'the proper rule under the Texas Constitution is the rule articulated by the United States Supreme Court in *Oregon v. Kennedy*," *i.e.*, whether the prosecutor intended to provoke the defendant into moving for a mistrial.  *Id.* at 337; *see id.* at 371.  *Lewis* also reaffirmed the holdings in *Ex parte Davis* and *Ex parte Mitchell*.  *Id.* at 371.  In *Davis* the court held that retrial was not jeopardy-barred under the U.S. Constitution when the conviction had been vacated because of, in part, prosecutorial misconduct.  *Ex parte Davis*, 957 S.W.2d 9, 11-12 (Tex. Crim. App. 1997).  In *Mitchell* the court held that retrial was not jeopardy-barred under the U.S. Constitution when the conviction was reversed because of a *Brady* violation.[3]  *Ex parte Mitchell*, 977 S.W.2d 575, 578-80 (Tex. Crim. App. 1998).

I believe that *Masonheimer* and other authorities strongly suggest that the Double Jeopardy Clause bars retrial when the State commits a *Brady* violation with the intent to avoid the possibility of an acquittal and the conviction has been reversed on appeal or collateral habeas corpus relief has been granted.  *See Masonheimer*, 220 S.W.3d at 506-08.  Also, the federal double jeopardy analyses in *Davis* and *Mitchell* have been criticized:

---

[2] The majority opinion acknowledges, (*ante* at 7, n.4), that approximately ten states, interpreting their own state constitutions, bar retrials after a conviction has been reversed because of intentional prosecutorial misconduct.

[3] *Davis* and *Mitchell* also both held that, under the now-overruled *Bauder* standard, retrial was not jeopardy-barred under the Texas Constitution.  *Davis*, 957 S.W.2d at 12-15; *Mitchell*, 977 S.W.2d at 580-81.

> The analytical double jeopardy standard adopted by the Supreme Court in *Oregon v. Kennedy* does not appear to include any consideration of whether the criminal defendant's ultimately successful motion for mistrial was granted during trial or on appeal. Therefore, this Court respectfully rejects that portion of the Texas Court of Criminal Appeals' analysis suggesting a constitutional distinction between cases in which a mistrial has been granted during trial and those in which a new trial is granted on appeal based on the same allegations of prosecutorial misconduct. *See Ex parte Jack Warren Davis,* 957 S.W.2d at 13 ("Applicant has not directed us to any cases, however, where the Supreme Court has explicitly extended *Oregon v. Kennedy* to apply to instances where verdicts of guilty have been reversed on appeal due to prosecutorial misconduct, and therefore holding retrials as jeopardy barred."). Given the plain language of the Supreme Court's opinion in *Oregon v. Kennedy,* this Court concludes the distinction offered by the Texas Court of Criminal Appeals is inconsistent with clearly established federal law.

*Davis v. Quarterman,* 2007 U.S. Dist. LEXIS 64793, at 53 n.31 (W.D. Tex. Jan. 22, 2007); *see Lewis,* 219 S.W.3d at 382-83 & nn.37-38 (Price, J., dissenting) ("Thus, to the extent these cases [*Davis* and *Mitchell*] are logically unfaithful to *Bauder,* they are equally unfaithful to the *Oregon v. Kennedy* standard. It seems to me that if any of our precedent deserves closer scrutiny, it would be *Davis* and *Mitchell,* not *Bauder.*"); *see also Albernaz v. United States,* 450 U.S. 333, 343, 101 S.Ct. 1137, 1144, 67 L.Ed.2d 275 (1981) ("the decisional law in the area [of Double Jeopardy] is a veritable Sargasso Sea which could not fail to challenge the most intrepid judicial navigator").

Near the same vein, Judge Meyers noted in *Davis* that *Kennedy* did not decide that double jeopardy would not bar retrial if an appellate court determined that the trial court erroneously denied a defense motion for mistrial based on prosecutorial misconduct because the *Kennedy* court's assumption that the appellate determination would present no bar is dicta. *Davis,* 957 S.W.2d at 17 (Meyers, J., concurring) (citing

*Kennedy*, 456 U.S. at 676, 102 S.Ct. at 2089-90). And the Supreme Court's statement in *Lockhart v. Nelson*, 488 U.S. 33, 34 n.2, 109 S.Ct. 285, 288 n.2, 102 L.Ed.2d 265 (1988), and its curious citation to *Kennedy*—"There is no indication that the prosecutor knew of the pardon and was attempting to deceive the court. We therefore have no occasion to consider what the result would be if the case were otherwise. *Cf. Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982)."—has led at least one court to note that the Supreme Court has left open the question whether appellate reversal for prosecutorial misconduct involving intentional deception may be sufficiently similar to *Kennedy* for retrial to be jeopardy-barred. *Jacob v. Clarke*, 52 F.3d 178, 181 (8th Cir. 1995) ("But the Court's latest signal is decidedly more ambiguous. In *Lockhart*, an appellate reversal case decided in the prosecution's favor, the Court introduced its double jeopardy analysis by stating that the record revealed no prosecutorial misconduct. Such a pointed caveat suggests that this remains an open issue.").

In conclusion, *Kennedy* neither decided the issue before us nor foreclosed it.

**Double Jeopardy Revisited**

A defendant has a "valued right to have his trial completed by a particular tribunal." *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949). "[H]is valued right to have the trial concluded by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury." *Arizona v. Washington*, 434 U.S. 497, 505, 98 S.Ct. 824, 830, 54 L.Ed.2d 717 (1978).

*Masonheimer* recognizes that under the circumstance of the State's belief that

undisclosed evidence may make "the difference between a conviction and an acquittal[, the defendant's] valued right to have his guilt-innocence determined by the jury in the first trial and, 'perhaps, end the dispute then and there with an acquittal' was something of a 'hollow shell' even though this may not have become apparent until the middle of the second trial." *Masonheimer,* 220 S.W.3d at 508 n.18 (citing *Oregon v. Kennedy,* 456 U.S. at 673, 102 S.Ct. at 2088). The State had its "one full and fair opportunity," but Graves's "valued right" to have his guilt-innocence determined by the first jury likewise was a "hollow shell" because, as the Fifth Circuit repeatedly emphasized (see n.4, *infra*), his trial was so tainted by the *Brady* violation and prosecutorial misconduct. *Cf. Robinson v. Wade,* 686 F.2d 298, 308 n.20 (5th Cir. 1982) ("Moreover, the defendant's valued right to go to a particular tribunal, involved in cases where the proceedings are not completed, is equally implicated where a motion for mistrial is denied, but the subsequent jury verdict is set aside for prosecutorial overreaching.") (citation omitted).

In such "a trial tainted by prejudicial . . . prosecutorial error," "[t]he important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed in the event of such error." *United States v. Dinitz,* 424 U.S. 600, 609, 96 S.Ct. 1075, 1080, 47 L.Ed.2d 267 (1976); *see Lewis,* 219 S.W.3d at 379 (Price, J., dissenting) ("And, at some point, prosecutorial misconduct may become so egregious that it cannot fairly be said that the defendant has retained primary control over the decision whether to proceed to verdict or abort the proceedings."). Unlike a defendant who becomes aware of a *Brady* violation or

prosecutorial misconduct during trial and can therefore either move for a mistrial or proceed to verdict, Graves did not learn of the exculpatory statements and prosecutorial misconduct for several years. Graves, therefore, not only had his valued right turned into a hollow shell, but the concealment of the *Brady* evidence and the corresponding prosecutorial misconduct deprived him of "primary control over the course to be followed in the event of such" misconduct.[4] Had Graves learned of the *Brady* evidence during trial and chosen to move for and received a mistrial, under *Masonheimer*, plainly retrial would be jeopardy-barred. And the notion that Graves can be retried because the prosecutor succeeded in hiding his actions during trial precariously jumbles double jeopardy principles. *Cf. Burks v. United States,* 437 U.S. 1, 11, 98 S.Ct. 2141, 2147, 57 L.Ed.2d 1 (1978) ("it should make no difference that the *reviewing* court, rather than the trial court, determined the evidence to be insufficient. . . . To hold otherwise would create a purely arbitrary distinction between those in petitioner's position and others who would enjoy the benefit of a correct decision by the District Court.").

---

[4] This was recognized by the Fifth Circuit:

> At trial the state recognized that its case depended on the credibility of Carter and the prosecutor emphasized Carter's consistency in his various statements in naming Graves as an accomplice. . . . Had the defense been able to cross-examine Carter on the suppressed statement, this may well have swayed one or more jurors to reject Carter's trial version of the events.

*Graves,* 442 F.3d at 341.

> If both statements had been timely furnished to Graves, he could have persuasively argued that (1) the murders were committed by Carter alone or by Carter and Cookie; and (2) Carter's plan from the beginning was to exonerate Cookie, but a story that he acted alone was not believable, so he implicated Graves so the prosecution would accept his story and decline to prosecute Cookie. . . . If the two statements had been revealed, the defense's approach could have been much different (as set forth above) and probably highly effective. . . . If the defense had known about the statement placing Cookie at the scene and given Carter's continuing condition that he would only testify if he were not asked about Cookie's involvement, the defense could have explained every statement implicating Graves as a means of protecting Cookie.

*Id.* at 343-44.

I believe, therefore, that an extension of *Kennedy* to the circumstances of this case

is consistent with and reinforces the Supreme Court's double jeopardy jurisprudence.

The Fifth Circuit has voiced this view:

> Nor is the rationale of *Burks* inconsistent with application of the "prosecutorial overreaching" exception to bar retrial where the overreaching caused a tainted verdict to be set aside, rather than a tainted proceeding to be aborted. *Burks'* holding, resting on a perceived dichotomy between reversals for trial error and reversals for evidentiary insufficiency, indicated that, as the former hold no implication for the guilt or innocence of the defendant, they would raise no bar to further prosecution. That distinction does not necessarily hold true where trial error is attributable to intentional prosecutorial overreaching. The extreme tactics which constitute prosecutorial overreaching offend the double jeopardy clause at least in part because they unfairly deprive the defendant of possible acquittal, by heightening, in a manner condemned by law, the jury's perception of the defendant's guilt. Whether the tactic condemned is successful in its objective of securing a mistrial, or unsuccessful, but causes the return of a verdict of conviction, would seem to be of little significance in development of a law of preclusion designed to protect this interest.

*Robinson*, 686 F.2d at 307-08 (citations and footnote omitted). And Judge Price, joined by

Judges Meyers and Holcomb, noted in *Lewis*:

> The State is entitled to one full and fair opportunity to present its evidence to an impartial jury. . . . When the prosecutor intentionally commits misconduct he knows will seriously compromise the fairness of the trial, he has arguably squandered his one full and fair opportunity to present his case, so that the State's interest can no longer be said to outweigh the defendant's—even if he did not harbor a specific intent to provoke a mistrial. If his intention was to inject manifest unfairness into the proceeding, and he was consciously indifferent with respect to whether this intentional misconduct illegitimately increased his chances of gaining a conviction or provoked the defendant into asking for a mistrial, the argument is practically as compelling that he has forfeited his one full and fair opportunity to present his case as when it was his specific intent to provoke a mistrial. Either way, a reasonable argument can be made that

the prosecutor has manipulated the defendant's choice to such an extent that it is no longer primarily the defendant's, and the State can no longer show that its interest outweighs the defendant's in the constitutional balance.

. . .

Ordinarily, double jeopardy entitles the defendant to proceed to verdict with the first tribunal selected. Manifest necessity or the defendant's own consent may suffice to defeat his constitutional interest, but not otherwise. This means that sometimes the defendant must experience the anxiety, expense, and delay of a second trial even when his first trial was rendered unfair for reasons unattributable to him. But he should not necessarily have to suffer that consequence when the retrial was attributable to deliberate misconduct on the part of the prosecutor. When that misconduct so compromised the fairness of trial as to render mistrial inevitable, and the prosecutor was at least consciously indifferent to that result, the State may reasonably be said to have abused its one full and fair opportunity to present its evidence to an impartial tribunal, and it can no longer carry its burden to demonstrate that its interest in the jeopardy balance outweighs the defendant's, even when it was the defendant who requested a mistrial. Thus, jeopardy principles are vindicated. It is true that the fairness that due process and due course of law guarantee may also be vindicated and that the prosecutor may feel he is being made to pay a heavy price for his misconduct. But these consequences are incidental to, and do not by any means displace, the jeopardy analysis.

*Lewis,* 219 S.W.3d at 380-82 (Price, J., dissenting).

Dicta from the Second Circuit's decision in *United States v. Wallach*, 979 F.2d 912 (2d Cir. 1992), suggests that the Double Jeopardy Clause might protect a defendant against retrial if the prosecutorial misconduct was undertaken with the intent of preventing an acquittal the prosecutor reasonably believed, at that time, was likely absent such misconduct. *Id.* at 916. *Wallach*'s proposed extension of *Kennedy* should be applied to this case because the *Brady* violation and prosecutorial misconduct were of such a nature that they could not have been discovered by the defense until after trial, and the actions were undertaken to avoid a likely acquittal.

In *Wallach*, the Second Circuit analyzed possible extensions of *Kennedy*'s holding. The government argued that *Kennedy* should be limited to the context of a criminal trial that ends with a defendant's successful motion for a mistrial. Like Wallach, Graves did not move for a mistrial, much less obtain one, because he did not know about the alleged misconduct until after trial. Wallach argued for an extension of *Kennedy* that would eliminate the requirement of a mistrial because he believed that the Supreme Court also intended *Kennedy* to bar a second prosecution when the prosecutor engages in serious misconduct with the intention of preventing an acquittal. *Id.* at 915. The Second Circuit suggested that some extension of *Kennedy* might be warranted, explaining:

> Since *Kennedy* bars a retrial on jeopardy grounds where the prosecutor engages in misconduct for the purpose of goading the defendant into making a successful mistrial motion that denies the defendant the opportunity to win an acquittal, the Supreme Court might think that the Double Jeopardy Clause protects a defendant from retrial in some other circumstances where prosecutorial misconduct is undertaken with the intention of denying the defendant an opportunity to win an acquittal.

*Id.* at 916.

The *Wallach* court went on to suggest that a narrower extension than the one sought by Wallach might be appropriate. The *Wallach* court believed that in *Kennedy*, the Supreme Court was attempting to delineate the distinction between prosecutorial misconduct that merely results in a mistrial (which does not bar retrial), and misconduct that is undertaken for the specific purpose of provoking a mistrial. According to the *Wallach* court, *Kennedy* bars retrial only in the latter case. *Id.* But, the *Wallach* court stated:

If any extension of *Kennedy* beyond the mistrial context is warranted, it would be a bar to retrial *only where the misconduct of the prosecutor is undertaken, not simply to prevent an acquittal, but to prevent an acquittal that the prosecutor believed at the time was likely to occur in the absence of his misconduct.*[5]  If jeopardy bars a retrial where a prosecutor commits an act of misconduct with the intention of provoking a mistrial motion by the defendant, there is a *plausible argument* that the same result should obtain where he does so with the intent to avoid an acquittal he then believes is likely.  The prosecutor who acts with the intention of goading the defendant into making a mistrial motion presumably does so because he believes that completion of the trial will likely result in an acquittal.  That aspect of the *Kennedy* rationale suggests precluding retrial where a prosecutor apprehends an acquittal and, instead of provoking a mistrial, avoids the acquittal by an act of deliberate misconduct.  Indeed, if *Kennedy* is not extended to this limited degree, a prosecutor apprehending an acquittal encounters the jeopardy bar to retrial when he engages in misconduct of sufficient visibility to precipitate a mistrial motion, but not when he fends off the anticipated acquittal by misconduct of which the defendant is unaware until after the verdict.  *There is no justification for that distinction.*

*Id*. (emphases added).

*Wallach*'s dicta has received support from Judge Posner:

There is an argument for a further extension of *Kennedy* that would bring [defendant's] case within the range of the double jeopardy clause.  Confined to cases in which the defendant is goaded into moving for a mistrial, whether the motion is granted or denied, *Kennedy* would leave a prosecutor with an unimpaired incentive to commit an error that would

---

[5] Based on the Fifth Circuit's opinion, there can be no question that the only reasonable inference on the prosecutor's intent in concealing Carter's exculpatory statements and then in also knowingly eliciting testimony that he knew was false and misleading because of the concealed exculpatory statements made to him the night before is that the prosecutor was acting with the intent to avoid the possibility of a likely acquittal.  *See Kennedy*, 456 U.S. at 675, 102 S.Ct. at 2089 ("Inferring the existence or nonexistence of intent from objective facts and circumstances is a familiar process in our criminal justice system."); *Masonheimer*, 220 S.W.3d at  507 & n.18 ("we are constrained to decide that the extensive portions of the record set out in this opinion support a finding that appellee's mistrial motions were necessitated primarily by the State's 'intentional' failure to disclose exculpatory evidence that was available prior to appellee's first trial with the specific intent to avoid the possibility of an acquittal. . . .  The trial court could have also reasonably found that the State believed that the undisclosed evidence may have made the difference between a conviction and an acquittal."); *id.* at 510 (Meyers, J., concurring) ("Rather than trying to determine the subjective intent of the prosecutor, we can objectively look at the actions of the State to determine if the actions were intentional.").

not be discovered until after the trial and hence could not provide the basis for a motion for a mistrial, yet would as effectively stave off an acquittal and thus preserve the possibility of a retrial. Suborning perjury would be a good example.[6] It can be argued that if the prosecutor commits a covert error for the same purpose that he might have committed an open error calculated to evoke a motion for a mistrial (before *Kennedy* made this tactic unprofitable)—namely, to prevent an acquittal and so preserve the possibility of retrying the defendant even if the error is sure to be discovered and result in a reversal of the conviction either on direct appeal or on collateral attack—the double jeopardy clause should protect the defendant against being retried.

*United States v. Catton,* 130 F.3d 805, 807 (7th Cir. 1997).

I would hold that the Fifth Amendment's Double Jeopardy Clause bars the State from retrying Graves. Because the majority does not, I respectfully dissent.


BILL VANCE
Justice

Dissenting Opinion delivered and filed November 5, 2008
Publish

---

[6] In Carter's testimony during Graves's trial, Sebesta questioned Carter as follows:
Q. With the exception of where you have totally denied everything, have you always implicated Graves as being with you?
A. Yes.
. . .
Q. With the exception of the time you went to the grand jury and denied any involvement, all the different stories that you told have all involved Anthony Graves, have they not?
A. They have.
Vol. 35, p. 3443.