Reversed and Remanded and Opinion
filed June 17, 2010.

 

In
The

Fourteenth
Court of Appeals



NO. 14-08-00710-CR



Jamie Pittman, Appellant 

v.

The State of
Texas, Appellee 



On Appeal from
the 241st District Court

Smith County, Texas

Trial Court
Cause No. 241-1412-07



 

OPINION

Appellant Jamie Pittman, the first of the alleged “Mineola
Swingers”[1]
was tried and convicted in March 2008 in Smith County, Texas of a single count
of aggravated sexual assault of a child.  He was sentenced to confinement for
life.  Appellant asserts five issues on appeal, but we reach only two.  Appellant
asserts the trial court reversibly erred by (a) not granting a new trial on Brady[2] violations,
and (b) permitting the State to introduce evidence of multiple other sexual
offenses allegedly committed against other children.  Because we agree the
trial court impermissibly allowed the State to interject extremely prejudicial
evidence of multiple other sexual offenses allegedly committed by appellant (and
others) into the guilt-innocence phase of this trial, we reverse and remand.

I.  Background

This case began when Department of Family and
Protective Services (“DFPS”) authorities in Smith County removed two children, Shannon,
age seven, and Holden, age six,[3]
from the home their mother, Shauntel Mayo shared with appellant.  The children
were removed after allegations of abuse and neglect were received by Smith
County DFPS.  After their removal, they went through several foster homes
before being placed with foster parents John and Margaret Cantrell.  At their
first few foster homes, there were some indications of problems with the
children:  Holden suffered from bowel issues and was very aggressive, and Shannon
acted very afraid. 

Several months after being removed from their parents
and once they were placed with the Cantrells, the children began to make
outcries involving a ring of adults allegedly engaged in training Shannon,
Holden, their four-year-old younger sister, Cathy, and their six-year-old aunt,
Ginny, to perform in a sexual manner in a club.  The outcries began when the
Cantrells took Shannon and Holden by an empty building they were considering purchasing
in the city of Mineola in Wood County.  The Cantrells immediately took the
children to the Mineola Police Department (the “Mineola PD”), but, after a one-
to two-day investigation, the Mineola PD did not file any charges.  Shannon and
Holden denied the allegations during a Wood County Children’s Assessment Center
interview.

Because the children were removed from their home in
Smith County, the Cantrells and the Smith County DFPS enlisted the assistance
of the Smith County District Attorney’s office to further inquire into the
children’s allegations.  Texas Ranger Phillip Kemp opened an investigation
after being contacted by the Smith County District Attorney’s office.  Kemp
interviewed Shannon and Holden and, through his investigation, discovered that Cathy
and Ginny also were allegedly involved in the sexual exploitation ring.  Cathy
and Ginny were removed from the home of Sheila and Jimmy Sones.  Sheila is the
mother of Mayo and Ginny and the grandmother of Shannon and Holden.  Cathy was
placed with the Cantrells, and Ginny was placed with another foster family.  

Shannon and Holden identified the building in Mineola
as a “club” in which they had performed sexual acts for numerous adults in
exchange for money collected by appellant and others, including Mayo.  The
children described a “sexual kindergarten” in which adults,[4] including appellant,
Mayo, and Patrick Kelly, trained them to masturbate, strip, and engage in
sexual contact with each another.  The children alleged that they then
performed sexual acts at the club in Mineola, where numerous other adults
watched, paid money, and filmed them engaging in the acts.  The children also
explained that the adults (appellant, Mayo, and Kelly) had given them “silly
pills,” which made them more willing to act in this manner.  The investigation
also revealed that Alicia, a friend of the other children, stated that Dennis
Pittman raped her.

Following Kemp’s investigation, appellant and several
others were indicted for numerous counts of aggravated sexual assault of a
child and engaging in organized criminal activity.  However, appellant was only
tried for a single count of aggravated sexual assault of a child, alleged to
involve only Shannon and Holden.  At his trial, the State proffered evidence of
the allegations against the other defendants, as well as appellant’s alleged involvement
in offenses against Cathy, Ginny, and Alicia.  Because appellant challenges the
admissibility of this testimony we will briefly highlight that evidence.  The objected-to
evidence and argument began with the State’s opening statement:

The evidence in this case is going to show that the defendant
and a group of other people would groom young children to perform sexual acts
with themselves and others.  You’re going to hear from [Shannon]; you’re going
to hear from [Holden]; from [Cathy]; and from [Ginny], all children under 14
years of age.  And what you’re going to hear is that starting at the age of
five, these kids were taken to kindergarten. 

. . .

They went to kindergarten so Jamie Pittman, the defendant
in this case, could teach them how to have sex.  Their kindergarten, which was
located at his trailer, was filled with dolls where they would learn how to
perform sexual acts using dolls.  

Then they graduate into masturbation.  The little girls [Shannon,
Cathy, and Ginny] would masturbate.  [Holden] would masturbate.  Ultimately,
they would have sex.  

The end goal of kindergarten was to graduate, not into the
first grade, not to use the tools that they’ve learned to better their lives,
but graduation for these kids was going to a swingers’ club in Mineola.

Smith County DFPS workers Amy McDonald, Alexia
Hunter, and Kristi Hachtel all testified on direct examination by the State
about the circumstances under which Shannon and Holden were removed from the
home of Mayo and appellant; these circumstances involved allegations of neglect
and drug abuse by appellant and Mayo.  During the direct examination of Hunter,
the State questioned her regarding a “continuing course of sexual abuse and
exploitation” of Shannon, Holden, and Cathy.  Hunter went on to describe allegations
of abuse against all four children, naming appellant, Dennis Pittman, Shauntel
Mayo, Sheila Sones, and Jimmy Sones as individuals involved in this continuing
course of sexual abuse.  Hunter explained that five-year-old Cathy would
masturbate until she bled, which is a sign of sexual abuse.  Hachtel described
the DFPS investigation that led to discovery of other alleged victims and
perpetrators.  She testified that all of the various defendants were involved
in this sex ring; that appellant tested positive for drugs; that he made the
children watch pornographic movies; and that appellant abused Cathy and Ginny. 
Additionally, Virginia Mayo, Shannon and Holden’s grandmother, testified that
appellant and Mayo were bad parents who did not feed or clothe the children properly
and that Cathy made an outcry to her about dancing, which led her to believe
Shannon and Holden’s story. 

When Kemp testified, the State questioned him about all
four children.  He testified that appellant abused Ginny and Cathy and that all
of the children were groomed at the kindergarten and then taken to the “swingers”
club in Mineola to dance on the stage for money, to perform sex on stage, and
to be videotaped by appellant having sex with each other.  Kemp also identified
the other defendants involved in the sex ring.  During his testimony, State’s Exhibit
37 was admitted showing a large family tree that lists eight children as having
been abused by the six defendants.  Also during Kemp’s testimony, a two hour
interview of Shannon and Holden was played to the jury detailing other victims
and other defendants.  

Margaret Cantrell, the foster mother of Shannon,
Holden, and Cathy, not only testified as the outcry witness for Shannon and
Holden, but also testified regarding the abuse of Cathy and Ginny.  She further
testified that Cathy masturbated until she bled.

Alicia, who was age fifteen at the time of
appellant’s trial, but who was eleven or twelve at the time of these events,
testified that she and Shannon had visited another bar and strip club and were
given drugs by Dennis Pittman—Alicia’s stepfather—and appellant.  According to
Alicia, Shannon was told to strip on stage, and when she refused she was taken
to a back room by appellant, Dennis Pittman, and “Tim.”  Alica also testified
that her step-father, Dennis, had raped her. 

Ginny testified to doing “bad stuff” with Shannon and
Holden in kindergarten, but stated that she never went to the club.  She used
appellant’s name during her testimony but did not identify him in court.  Cathy
testified about doing sexual “stuff” in kindergarten, dancing at the club for
money, and being videotaped by appellant doing sexual “stuff.”  Shannon and Holden
testified after most of the other witnesses in this case had testified; both testified
about the other alleged perpetrators and victims.  The only witness to testify
after Shannon and Holden was the State’s expert on child sexual assault, who
related that all of the children’s stories were consistent and believable.

In its charge, the trial court instructed the jury
regarding the use of any extraneous offense evidence as follows:

You are instructed that if there is any testimony before
you in this case regarding the defendant’s or any other individuals’ having
committed offenses other than the offense alleged against him in the indictment
in this case, you cannot consider said testimony for any purpose unless you
find and believe beyond a reasonable doubt that the defendant committed such
other offenses, if any were committed and even then you may only consider the
same in determining the motive, opportunity, intent, preparation, plan,
knowledge, identity of the defendant or absence of mistake or accidence [sic],
if any, in connection with the offense, if any, alleged against him in the
indictment in this case, and for no other purpose.

During closing argument, the
prosecuting attorney reminded the jury of this caveat, yet continued to focus
on appellant’s involvement in a child sexual abuse scheme:

[Y]ou can consider that [extraneous offense evidence] for a
limited -- at this point in the trial, for limited reasons.  His plan, their
plan, the scheme, how the operation worked, their knowledge, the defendants’
identity.  

Because let me stop you right there.  These kids were
sexually assaulted, period.  Because if you want to go down the whole road
of, “You know what; they just got into foster care and are making this up,”
let’s go down that road for a second.

If that’s true, explain to me -- and if you buy that, if
you buy that, I’ll wait for you.  I’ll meet you at your homes.  Explain to me
then why little [Cathy], at five years old, is masturbating to the extent where
her five-year-old vagina is bleeding.  Explain that to me.

Explain to me then why [Shannon] knows how to do a
striptease, why she’s masturbating to the extent that she is.  Explain to me
that.

Explain to me why [Holden], nine-year-old [Holden], is
using the bathroom on himself.

And that’s just with those three.  You know what?  You
can’t explain that by saying this is all just made up.  But it didn’t end
there.  Explain to me if this is all made up, why [Ginny], who had absolutely
no contact, tells you the same thing.

And explain to me why [Alicia], who’s all the way up in
Wisconsin, comes down here from there and talks to you about happy pills,
[Shannon] dancing, Dennis Pittman, Jamie Pittman, and everybody else we’ve
heard about.

Let me tell you something.  This isn’t some great conspiracy
hatched by these kids, investigated by the Texas Rangers, and tried by the
Smith County District Attorney’s Office against Jamie Pittman.  That’s not what
happened.

What happened is, Jamie Pittman did this.  As disgusting
and vile as it is, he did it.

. . .

And let’s go over that.  Let’s go over what it was like.  What
must it be like to be five, six, seven, eight, and the people you call
Mommy, Daddy, Grandma, Grandpa teach you how to masturbate using dolls when
you’re five.

They divide you in different classes.  They teach you how
-- using these dolls, how to masturbate.  And these are the same people who
are supposed to protect you.  These are the same people who are supposed to
do anything they can to ensure that you don’t have to go through this.  But
what they do, what Jamie Pittman does, is he takes them to his house, to Booger
Red’s house, to Mineola, and he teaches them how to masturbate using dolls.  And
Shauntel Mayo, Booger Red, and Dennis Pittman, Sheila Sones, Jimmy Sones teach
them how to strip, teach them how to dance, teach a sister how to have sex with
her brother, teach an aunt how to have sex with her niece and her nephew and
vice versa. 

(emphasis added).  The
prosecuting attorney continued his closing argument in a similar vein,
emphasizing that appellant, Mayo, Kelly, Dennis Pittman, Sheila Sones, and
Jimmy Sones all worked together in a group to groom the children by teaching
them to masturbate and dance together, culminating their “education” by forcing
them to strip and have sex with each other at the club in Mineola.

After hearing the evidence and argument of attorneys,
the jury found appellant guilty as charged in the indictment and sentenced him
to life in prison.  Appellant timely appealed.

II.  Issues Presented

Appellant presents five issues for our review.  In
his first issue, appellant contends the trial court erred in denying his motion
for new trial based on Brady violations.  In his second issue, appellant
asserts the trial court reversibly erred by permitting the State to introduce
evidence of drug use and multiple other sexual offenses appellant allegedly
committed against other children.  We do not reach issues three through five.

III.  Analysis

A.        This Record Does
Not Confirm Brady Violations

Appellant asserts the trial court erred in denying
his motion for new trial based on the State’s failure to disclose exculpatory
evidence to him in violation of Brady v. Maryland, 373 U.S. 83 (1963). 
We review a trial court’s ruling on a motion for new trial for an abuse of
discretion.  State v. Herndon, 215 S.W.3d 901, 906–07 (Tex. Crim. App.
2007).

            Appellant
filed a motion for new trial on April 28, 2008,[5]
alleging the Smith County District Attorney had concealed exculpatory information
from his defense team in violation of Brady.  This information involved
an investigation in California, where the Cantrells previously lived,
concerning allegations that John Cantrell had sexually molested at least one of
his former foster children.  Appellant attached an affidavit to his motion for
new trial in which his attorney averred that he had discovered the ongoing
California investigation through contact with the Wood County District Attorney’s
office.  The Smith County prosecutor responded that the Smith County District
Attorney’s office was unaware of this information.  The motion for new trial was
overruled by operation of law.

In his original brief on appeal, appellant asserts
two areas of Brady information that were not disclosed to him:  (1) John
Cantrell was the subject of an aggravated sexual assault investigation in
California following a complaint by other foster children, and (2) Kemp had
located and interviewed  at least one of the owners of the Mineola “swingers”
club, Sherry Adams, who had explained that no children had ever been admitted
to the club and that she did not recognize any of the defendants arrested and
charged in these cases.  In supplemental briefing after oral argument,
appellant identified other previously undisclosed exculpatory material,
including two videotapes of two of the children denying any abuse occurred, a seventy-nine
page report from Kemp of which only fifty-five pages had previously been
produced, and hand-written notes by Kemp, including notations recommending
interviews of other children Shannon had identified as being abused.  

The only Brady complaint included in the
record of this case, however, concerns the sexual assault allegations
against John Cantrell.  As noted above, appellant identified this information
in his motion for new trial; his attorney attached an affidavit to the motion
indicating that he discovered these allegations from the Wood County District
Attorney’s office.  However, the State’s prosecuting attorney, Joseph Murphy,
responsed to the motion for new trial with an affidavit, dated June 10, 2008,
in which he stated that he “had no knowledge of any allegations [against John
Cantrell] that were made in California and had no way of ascertaining that
information.  A run of Mr. Cantrell’s Criminal History contains no felony
arrests or convictions for any offense out of California.”  He denied that Wood
County had supplied this information to him or to his office.

On the day of oral argument in this case, Wood County
filed an amicus curiae brief through its District Attorney.  The brief
contained sworn grand jury testimony from a Wood County DFPS employee who
claimed that both Kemp and a Smith County Assistant District Attorney, Tiffany
Wickel, knew about the allegations against Cantrell in 2005 and 2007
respectively.  However, this court is constrained to review only the record in
this case.  Although appellant argues that Wood County’s District Attorney’s
brief should be considered an admission by a party opponent because both Wood
County and Smith County represent the State, he cites no cases in support of
that proposition.  We decline to so hold.  Furthermore, amicus briefs generally
cannot be used to supplement the record.  Cf. Booth v. State, 499
S.W.2d 129, 135–36 (Tex. Crim. App. 1973) (observing that “the office of amicus
curiae is to aid the court and it cannot be subverted to the use of a litigant
in the case” and that a brief challenging the validity of record testimony is
not a proper function of an amicus curiae).  

Appellant’s motion for new trial did not mention the
other exculpatory evidence that he now claims should have been revealed.  Part
of this information was discovered during Patrick Kelly’s trial and is not part
of this record; part of this information was discovered in the Dennis Pittman
pre-trial proceedings and also is not part of this record. See Smith
v. State, 540 S.W.2d 693, 697 n.4 (Tex. Crim. App. 1976 ) (op. on reh’g)
(citing Booth, 499 S.W.2d at 135–36 and noting that trial transcript
from another trial is not properly a part of record on appeal and cannot be
considered by appellate court).  Thus, we may not consider it in this appeal
and appellant’s only remedy, if necessary, is through a habeas corpus
proceeding.[6]


In sum, “‘Brady and its progeny do not require
prosecuting authorities to disclose exculpatory information to defendants that
the State does not have in its possession and that is not known to exist.’”  Harm
v. State, 183 S.W.3d 403, 407 (Tex. Crim. App. 2006) (quoting Hafdahl v.
State, 805 S.W.2d 396, 399 n.3 (Tex. Crim. App. 1990)).  The record in
this case reflects that Smith County issued a sworn statement that it did
not have the Brady information regarding John Cantrell in its possession
during appellant’s trial.  Being constrained to review only the record of this
case, we cannot say the trial court abused its discretion in failing to grant
appellant’s motion for new trial.  We therefore overrule his first issue
without reaching the issue of bad faith.[7] 


B.        Evidence of Extraneous
Offenses Should Not Have Been Admitted

Appellant asserts in his second issue that the trial
judge erred in permitting the State to introduce evidence of drug use by the
appellant, multiple other sexual offenses allegedly committed by appellant and
five others, including multiple sexual offenses involving three more child victims.
 Over appellant’s objections based on Texas Rules of Evidence 403 and 404(b),[8] the State
proffered evidence regarding the involvement of each of the other charged defendants
in the case, as well as appellant’s involvement in offenses against Cathy,
Ginny and Alicia, to show appellant’s “scheme” or “plan.”

Appellant obtained running objections to all testimony
regarding his alleged drug use and all testimony about and by the other children
allegedly abused by appellant and the other defendants.  Such testimony
included allegations of sexual “grooming” of numerous children by six adults, the
existence of a child sex ring, children dancing for money, videotaping the children
having sex, providing drugs to the children, showing them pornographic movies,
and the rape of Alicia by Dennis Pittman.  

            1.         Standard
of review. 

We review a trial court’s evidentiary rulings for an
abuse of discretion.  Powell v. State, 63 S.W.3d 435, 438 (Tex. Crim.
App. 2001).  The erroneous admission of extraneous-offense evidence constitutes
non-constitutional error, reviewable for harm under Texas Rule of Appellate
Procedure 44.2(b).  Hernandez v. State, 176 S.W.3d 821, 824 (Tex. Crim.
App. 2005).  This rule provides that we must disregard “any
[non-constitutional] error, defect, irregularity, or variance that does not
affect [an appellant’s] substantial rights[.]”  Tex. R. App. P. 44.2(b).  

2.         Admitting the evidence was an abuse of discretion.

a.         The trial
court’s reason for admitting the evidence

This trial involved the single indicted offense of aggravated
sexual assault of a child.  The State sought to consolidate this charge with
three other offenses under Texas Penal Code section 3.01 but was unsuccessful
and proceeded to trial on this charge alone. 

We begin by noting that although appellant focuses on
the trial court’s decision to admit this evidence over his Rule 403 objection,
the trial court seemingly permitted much of the extraneous-offense evidence to
show appellant’s “plan” to engage in a sexual exploitation/abuse scheme with
several other defendants.  See Tex.
R. Evid. 404(b) (permitting introduction of extraneous-offense evidence to
show proof of motive, opportunity, intent, preparation, plan, knowledge,
identity, or absence of mistake or accident).  For example, the trial court
stated in overruling appellant’s objections to extraneous-offense evidence
during the testimony of DFPS worker Hachtel, “It surely shows plan, scheme and
design.”  The trial court further observed, “[T]he theory of the State’s case
is that this was a sex ring, that there was more than just one individual
involved in it.”  

But appellant was charged with only a single count of
aggravated sexual assault of a child, alleged as follows:

[Appellant] did then and there intentionally or knowingly
cause the female sexual organ of [Shannon], a child who was then and there younger
than 14 years of age and not the spouse of the defendant, to contact and
penetrate the sexual organ of [Holden.]

He was not on trial for multiple
counts of aggravated sexual assault involving victims other than Shannon and
Holden; neither was he being tried for engaging in an organized scheme or plan
to sexually assault multiple victims.  

As the Court of Criminal Appeals has explained, 

Unfortunately, courts frequently admit evidence of
extraneous acts under this exception not to show acts the defendant took in
preparation for the ultimate charged offense, but to show repeated acts that
are similar to the charged offense.  Repetition
of the same act or same crime does not equal a “plan.”  It equals the repeated
commission of the same criminal offense offered obliquely to show bad character
and conduct in conformity with that bad character—“once a thief, always a
thief.”  This bad-character-conformity purpose, whether express or not, is
precisely what is barred by Rule 404(b).   Thus, if the proponent is unable to
articulate exactly how an extraneous act tends to prove a step toward an
ultimate goal or overarching plan, the evidence is not admissible to prove part
of a “plan.”

Daggett v. State, 187
S.W.3d 444, 452–53 (Tex. Crim. App. 2005).  Similarly, the evidence of extraneous
acts admitted here does not show a plan to sexually assault Shannon and Holden. 
Rather it is evidence of repeated occurrences of the same bad act, compounded
by numerous additional bad acts. 

On appeal, the State argues the evidence was
necessary to show appellant’s intent, but this basis for admitting this
evidence was not asserted in its proffer at trial, other than in generalized
quotes of the language of Rule 404(b).  Further, appellant did not assert that
the children were “accidentally” sexually assaulted or that they had
“consented.”  The State further argues in its brief that the evidence showed
that appellant had abused three other children in an identical manner, but this
argument is not supported by the record.  For example, Alicia did not testify
to abuse by appellant, only by Dennis Pittman.  The State argues that “all five
children” testified to being trained by appellant at kindergarten to sexually
perform, when in fact Alicia did not testify to that.  Alicia did not testify
about kindergarten or the club in Mineola.  With this in mind, we turn to
appellant’s Rule 403 objections.

            b.         Rule 403 balance weighs
against admission. 

In determining a Rule 403 objection, the trial court
balances the probative force of and the proponent’s need for the evidence
against any tendency of the evidence to (a) suggest a decision on an improper
basis, (b) confuse or distract the jury from the main issues, (c) be given
undue weight by a jury not equipped to evaluate the probative force of the
evidence, and (d) consume an inordinate amount of time or repeat evidence
already admitted.  Gigliobianco v. State, 210 S.W.3d 637, 641 (Tex.
Crim. App. 2006).  

i.                   
Probative force and necessity of the evidence

We begin our analysis of this issue by examining the
probative force and the need for this evidence.  As noted above, appellant was on
trial for a single offense:  aggravated sexual assault of a child, involving
only Shannon and Holden.  The proffered extraneous- offense evidence included
evidence of drug use by appellant, and testimony that appellant and several other
defendants trained numerous children in sexual activity by conducting a “sexual
kindergarten,” where the children learned to masturbate, dance “sexy,” and
touch each other inappropriately.  Evidence also was offered to show that
appellant and these other defendants transported the children into another
county and forced them to perform sexual acts in front of other pedophiles from
whom they received money, and that appellant and the other defendants provided
drugs to these children to get them to perform sexually and sometimes filmed
them engaging in sex acts.  In addition, the proffered evidence included
testimony regarding offenses against several children who were not included in
the indictment.  But this extraneous-offense evidence does not appear to be
particularly probative of the offense for which appellant was actually being
tried—the aggravated sexual assault of Shannon and Holden.  Cf. Daggett,
187 S.W.3d at 450–51 (“While such [extraneous-offense]
evidence will almost always have probative value, it forces the defendant to
defend himself against uncharged crimes as well as the charged offense, and
encourages the jury to convict a defendant based upon his bad character, rather
than proof of the specific crime charged.”).  

Further, this evidence was not necessary to prove the
allegations against appellant; the testimony of Shannon and Holden alone, if
believed by the jury, would have been sufficient to convict appellant.  See
Tex. Code Crim. Proc. Ann. art.
38.07 (providing that testimony of child under 17 alone is sufficient to
convict defendant of sexual assault of a child). 

Finally the State argues that the other children were
eyewitnesses to the abuse and that they had to testify as to why they were at
the club and kindergarten.  First, not all of the children were alleged eyewitnesses.
 For example, Alicia did not testify that she witnessed an assault involving Shannon
and Holden.  Cathy did not testify to seeing an assault between Shannon and
Holden, and Ginny testified she never went to the club.  Second, there is no
reason that an eyewitness would have to testify as to why she was at the club
or kindergarten or whether she was abused, or testify to any of the other
extraneous acts presented in this trial.  We thus conclude that the extraneous-offense
evidence in this case was neither particularly probative of the charged offense
nor necessary to the State’s case.  

ii.                
Balancing factors

We next turn to the other Rule 403 factors against
which this evidence must be balanced:  the tendency of the evidence to (a)
suggest a decision on an improper basis, (b) confuse or distract the jury from
the main issues, (c) be given undue weight by a jury not equipped to evaluate
the probative force of the evidence, and (d) consume an inordinate amount of
time or repeat evidence already admitted.  Gigliobianco, 210 S.W.3d at
641–42. 

Appellant was charged with one count of aggravated
sexual assault of a child, but during the direct examination of Ranger Kemp,
the following exchange occurred:

Q.:       Is there a continuing course of criminal conduct
that you discovered that started when these kids were five-year-old kids and
went to kindergarten up until they were able, for lack of a better term,
graduate to being able to have sex with one another on a stage in Mineola,
Texas, filled with other perverts who are sitting there paying money, watching
them?

A.:       Yes.  It was all one continuing scheme.

During the testimony of
Margaret Cantrell, the State made the following observation: “[W]e’re talking
about children who were forced to engage in sexual conduct and contact with
brothers and sisters, with aunts, dancing around so people like Jamie Pittman
could make money and fulfill his sexual desires.”  

The evidence took up a vast amount of time and was
repeated by many witnesses. As detailed above, the State focused extensively on
the extraneous-offense evidence throughout appellant’s trial, from opening
statement, through the direct examination of witnesses, to closing argument.  In
fact, during the entire guilt-innocence portion of appellant’s trial, there
were only three minor witnesses (out of fifteen) who did not testify about the
other defendants and the other alleged victims and crimes. 

We thus conclude that this extraneous-offense
evidence had an extremely strong tendency to suggest a decision on an improper
basis, to confuse or distract the jury from the main issues in this case, and
to be given undue weight by a jury not equipped to evaluate its probative
force.  After balancing the lack of probative force and necessity here versus
the potential harm of the evidence, we hold that the trial court abused its
discretion in overruling appellant’s Rule 403 objections.

3.         Appellant’s
substantial rights were affected.

“The general rule in all English speaking
jurisdictions is that an accused is entitled to be tried on the accusation made
in the State’s pleading and not on some collateral crime, or for being a
criminal generally.  The rule is now deemed axiomatic and is followed in all
jurisdictions.”  Young v. State, 159 Tex. Crim. App. 164, 165, 261
S.W.2d 836, 837 (1953).  Here, admission of this extraneous-offense evidence permitted
the State to portray appellant as a drug abuser and as a sexual predator
engaged in an organized and ongoing scheme involving multiple sexual assaults
against multiple children, sexual performances of a child, and child
pornography.  This alleged scheme included a group of like-minded child
predators (who were in a position of trust and authority as parents,
grandparents, or stepparents) working together to “groom” a group of very young
children—all under the age of six or seven—to perform sexually with each other
at a “sexual kindergarten.”  It was alleged that at this “kindergarten,” these
adults taught the children to masturbate, touch each other, and engage in sex
acts.  These adults also allegedly provided drugs to the children to make them
more willing to engage in these activities.  According to the State, the
ultimate goal of this group of child predators was to have the children perform
sex acts in front of other pedophiles for money.  This group of pedophiles also
filmed the children engaging in these sexual activities.  One of the other
adults also purportedly raped his twelve-year-old step-daughter.  

Considering the manner in which this evidence was
introduced—by the State—on direct examination, rather than on re-direct or as
rebuttal evidence, the focus of the State’s opening statement and closing
arguments, and the extremely prejudicial nature of the evidence itself, we
conclude that the introduction of this evidence had a substantial and injurious
effect or influence in determining the jury’s verdict.  See Motilla v. State,
78 S.W.3d 352, 355 (Tex. Crim. App. 2002).  Indeed, it is difficult to
imagine how a juror could have considered this inflammatory, prejudicial
evidence only for non-character purposes.  We therefore sustain appellant’s
second issue.

IV.  Conclusion

            Had the State
tried appellant only for the offense with which he was charged, aggravated
sexual assault of a child, it might have convicted him of that offense. 
Unfortunately, in this case, the trial court permitted the State to try appellant
for being a criminal generally, rather than for the offense for which he was
indicted.  In fact, he was tried for being the worst sort of criminal:  a child
predator who engages in an organized and ongoing scheme with other pedophiles
to sexually abuse young children.  We therefore sustain appellant’s second
issue and, without addressing his other three issues,[9] reverse and
remand for a new trial.

 

 

                                                                                    

                                                                        /s/        Tracy
Christopher

                                                                                    Justice

 

 

Panel consists of Chief Justice Hedges
and Justices Anderson and Christopher.

Publish
— Tex. R. App. P. 47.2(b).









[1]
See Mayo v. State, Nos. 14-08-00622-CR, 14-08-00623-CR, 14-08-00624-CR,
tried in May 2008; Kelly v. State, No. 14-09-00166-CR, tried in August
2008. All three appeals were transferred to this court.





[2]
See Brady v. Maryland, 373 U.S. 83 (1963).





[3]
We have employed pseudonyms for the children to protect their identities.





[4]
Cases are pending in a Smith County district court against three other
defendants, including Dennis Pittman, Sheila Sones, and Jimmy Sones.   





[5]
This was before the start of Shauntel Mayo’s trial.  See Mayo v. State,
Nos. 14-08-00622-CR, 14-08-00623-CR, 14-08-00624-CR, footnote 1.





[6]
Because we reverse and remand this case on another issue, we are confident that
Smith County will provide any and all exculpatory evidence to appellant before
his re-trial.

 





[7]
Appellant cites Oregon v. Kennedy, 456 U.S. 667, 676, 679 (1982), and Ex
parte Masonheimer, 220 S.W.3d 494, 506 (Tex. Crim. App. 2007), to support
his claim that, if bad faith is found in the State’s actions, a retrial is
barred.  However, these cases discuss and delineate the “‘narrow exception’ to
the general rule that there is no jeopardy bar to a retrial after a
defense-requested mistrial.”  Masonheimer, 220 S.W.3d at 506–07
(citing Kennedy, 456 U.S. at 673, 676, 678–79) (emphasis added).  This
exception  usually means that a retrial after a defense-requested mistrial
is barred by double jeopardy only when the prosecutorial conduct giving rise to
the mistrial was “intended to provoke [or goad] the defendant into moving for a
mistrial.”  Masonheimer, 220 S.W.3d at 506 (citing Kennedy, 456
U.S. at 676, 679).  Thus, neither of these cases support appellant’s contention
that a retrial is barred when an appellate court reverses for Brady
violations.  See also Ex parte Legrand, 291 S.W. 3d 31 (Tex. App.—Houston
[14th Dist. 2009, pet ref’d) (holding that there is no double
jeopardy after a verdict was reversed on appeal); Ex Parte Graves, 271
S.W.3d 801 (Tex. App.—Waco 2008, pet. ref’d) (same).





[8]
Texas Rule of Evidence 403 provides as follows:

Although relevant, evidence
may be excluded if its probative value is substantially outweighed by the
danger of unfair prejudice, confusion of the issues, or misleading the jury, or
by considerations of undue delay, or needless presentation of cumulative
evidence. 

Tex. R.Evid. 403.  Rule 404(b) provides that, although not
admissible to prove conduct or behavior in conformity with character,
extraneous offense evidence may be admissible for other purposes, “such as
proof of motive, opportunity, intent, preparation, plan, knowledge, identity,
or absence of mistake or accident” so long as, if requested by the accused,
proper notice has been provided in advance of trial.  Tex. R. Evid. 404(b).





[9]
See Tex. R. App. P. 47.1
(stating that courts of appeals must issue an opinion that is “as brief as
practicable but that addresses every issue raised and necessary to final
disposition of the appeal”).