United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 3, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 05-70011

ANTHONY GRAVES,

Petitioner - Appellant,

versus

DOUG DRETKE, Director,
Texas Department of Criminal Justice, Correctional Institutions
Division,

Respondent, Appellee.

Appeal from the United States District Court
for the Southern District of Texas

Before DAVIS, WIENER, and GARZA, Circuit Judges:

W. EUGENE DAVIS, Circuit Judge:

Petitioner Anthony Graves appeals the district court's denial of his writ of habeas corpus. Because we conclude that the statements suppressed from the defense were both exculpatory and material, we reverse the judgment of the district court with instructions to grant Graves' writ of habeas corpus.

I.

Anthony Graves was convicted of capital murder and sentenced to death in 1994 for the capital offense of murdering six people in the same transaction. The procedural history of Graves'

conviction, post-conviction appeals and writ petitions is presented in our previous opinions addressing Graves' application for certificate of appealability. This court originally granted COA only on Graves' <u>Brady</u> claim that the state failed to disclose to Graves that key prosecution witness and Graves' co-defendant Robert Earl Carter informed the district attorney that Graves was not involved in the charged crime on the day before he testified to the contrary at Graves' trial. <u>Graves v. Cockrell</u>, 351 F.3d 143 (5th Cir. 2003)("Graves I"). On rehearing, this court modified its order and also granted COA on Graves' claim that the state's failure to disclose Carter's alleged statement implicating his wife in the crimes violated Graves' rights under <u>Brady</u>. <u>Graves v. Cockrell</u>, 351 F.3d 156 (5th Cir. 2003)("Graves II"). The case was remanded to the district court

> for an evidentiary hearing to determine: (1) the substance of the alleged statement described above, along with Carter's statement allegedly exonerating Graves; (2) whether Graves was aware of these statements or exercised due diligence to discover these statements; (3) whether the state's failure to disclose these statements was material to Graves' defense under Brady; and (4) for a determination of whether Graves is entitled to relief on these claims.

<u>Graves II</u>, 351 F.3d at 159. COA was denied on all other claims.

On remand, an evidentiary hearing was held before Magistrate Judge Froeschner who, after reviewing briefly the facts of the crime, made the following factual findings in his report and recommendation.

> Carter's wife, Cookie, was also indicted for the offense of capital murder. Attorneys Calvin Garvie and

Lydia Clay-Jackson, who defended Graves at trial, believed this indictment to be a sham based on false evidence presented to the grand jury and obtained only in order to pressure Carter to testify against Graves. Evidentiary Hearing Transcript ("EHT") at 129, 168. Nevertheless, Burleson Country District Attorney Charles Sebesta, who prosecuted Graves, insisted that the State believed from early on that Cookie participated in the killings and that all evidence pointed to the involvement of three people. Id. at 57, 98. Indeed, the State's theory from the beginning of the trial was that at least three people had acted together in the murders. Id. at 174.[1] Texas Ranger Coffman testified at trial that his investigation showed "at least three and possibly four" perpetrators were in the Davis home when the murders occurred. Trial Transcript ("TT"), vol. 38 at 3728.

Prior to the beginning of Graves' trial, the District Attorney's office had been in negotiations with Carter and his appellate attorney for Carter's testimony against Graves. According to Sebesta, no final agreement on the terms had been reached prior to Carter's arrival in Brazoria County for Graves' trial, although any final plan was to involve the use of a polygraph exam before he testified. Id. at 51. The early discussions also involved Carter's condition that the State would not ask him questions about his wife's role in the murders. Id. at 54.

Sebesta met with Carter in the early evening of October 21, 1994.[2] According to Sebesta, Carter almost immediately claimed, "I did it all myself, Mr. Sebesta. I did it all myself." Id. at 60. When Sebesta stated that he knew that was not true because of the number of weapons used, Carter quickly changed his story and claimed that he committed the murders with Graves and a third man called "Red." Id. at 61, 94, 95. Carter had earlier implicated a person named "Red" during the murder investigation, and the State believed that Theresa Carter may have been known by that nickname. Petitioner's Ex. 9 at 24. When Sebesta proposed that

---

[1] This theory appears to be based on the number of victims, six, and the number of murder weapons, three (a gun, knife and hammer), not on any specific physical evidence.

[2] This was the evening of the second day of the guilt/innocence phase of the trial.

"Red" was actually Cookie, Carter denied it and agreed to take a polygraph exam. EHT at 95.

Since the polygraph examiner had been out sick that day, he was called to come in to administer the exam. Id. at 96. The report states that Carter signed a polygraph release statement, had the exam explained to him, and then changed his story once more before the exam was given by stating that he had killed the Davis family with Graves but without "Red." Petitioner's Ex.9 at tab 4. The interviewer then posed the following questions to Carter: (1) "[W]as your wife, Theresa, with you [at the time of the murders]?" and (2) "[W]hen you refer to 'Red' in your statement, are you taking about your wife, Theresa?" Id. Carter answered "no" to both questions. The polygraph examiner concluded that Carter was not being truthful in either response. Id. When the polygraph results were explained to him, Carter once more changed his story. He now admitted that Cookie was involved in the murders with himself and Graves. He also stated that he had invented the character "Red" but later admitted that Cookie was sometimes called "Red." Id. When Sebesta asked him if Theresa had used the hammer in the murders, Carter answered "yes." EHT at 96.

In addition to the tentative deal to forego questions about Cookie in exchange for testifying against Graves, the State had also been working on a broader agreement that would allow Carter to accept a life sentence rather than death if his case were reversed in appeal. This required Carter to testify against both Graves and Cookie. Id. at 67. By the time the October 21 meeting concluded, he had tentatively assented to do so, though no final agreement was reached. Id. at 62, 103, 105. The next morning, however, Carter refused to testify against Cookie and reverted to the initial terms already worked out with the State. Both Carter and Sebesta then accepted the tentative agreement as the final deal for his testimony.

At the evidentiary hearing, Garvie denied that he knew before, or at any time during, trial that Carter had told Sebesta he killed the Davis family himself. Sebesta testified that he mentioned the statement to Garvie on the morning Carter testified. Id. at 149. The Court accepts Garvie's version of this event based on his credibility as a witness and as being consistent with his vigorous defense of Graves at trial. Sebesta

did reveal part of the polygraph results on the morning of October 22 when he told the trial judge: "last night at 8:30 Mr. Carter took a polygraph[,] and the basic question involved his wife, Theresa. It shows deception on that polygraph examination. But, obviously, we can't go into polygraphs here, but I think counsel is certainly entitled to know that." TT, vol. 35 at 3360. Garvie asked no questions about what the polygraph involved. Garvie's co-counsel testified that it did not occur to the defense to inquire into Sebesta's statement because they believed the indictment against Cookie was unfounded. EHT at 134. Nor did it fit the defense's theory of the case. According to Ms. Clay-Jackson, the defense thought that at least two people were involved in the killings but that Cookie was not one of them. Id. at 122. The State then called Carter to the stand and revealed to the jury that he was testifying in exchange for an agreement that questions would not be asked about his wife. TT, vol. 35 at 3429.

Graves' habeas attorneys appear to have first learned of Carter's statement, "I did it all myself," in 1998. On June 19, 1998, Graves' former attorney took a deposition from Carter in which he claimed to have acted alone. *Ex parte Graves*, No. 40,812-01 at 97 ff. That statement was excluded from the record by the state court as inherently unreliable because Graves' attorney failed to notify the State, as required by law, in order to allow cross-examination. Carter again recanted his trial testimony in a May 18, 2000, deposition attended by both Sebesta and Graves' current counsel. Sebesta later appeared on the Geraldo Rivera show *Deadly Justice* on September 3, 2000, and repeated Carter's self-confession. Sebesta stated: "yes, and at that point he [Carter] did tell us, 'Oh, I did it myself. I did it.' He did tell us that." Petitioner's Ex. 1.

The magistrate judge found that Sebesta did not reveal Carter's statement that he committed the murders alone to the defense and that because Graves' attorneys had no way of knowing about the statement, they had no reason to exercise due diligence to discover it. The magistrate also found that this statement was not material because Carter's claim that he acted alone

contradicted the evidence and because the jury already had considerable evidence of Carter's multiple inconsistencies and credibility issues.

As to the statement linking Carter's wife Cookie as a direct participant in the crimes, the magistrate found that the defense did not exercise due diligence to discover the statement after Sebesta told them about the polygraph results. He also found that the statement is not exculpatory because it implicated Graves based on the government's three person theory. The statement would also have contradicted the testimony of one of Graves' witnesses who testified that Cookie and Graves were not close and that Cookie was home at the time of the murders.

Considering the effect of the statements together, the magistrate found that the same conclusion would be reached. The three person version of the crime, which implicated Cookie, was most consistent with the State's versions of events and would have reinforced prior statements by Carter also implicating Graves.

The district court considered Graves' objections to the magistrate's report and recommendation, dismissed them all and accepted the magistrate's report, denying Graves' Brady claims. The district court also denied Graves' Motion to Abate, which is not raised as an issue in this appeal. Graves appeals.

II.

In a federal habeas corpus appeal, we review the district court's findings of fact for clear error and its conclusions of law *de novo*. Valdez v. Cockrell, 274 F.3d 941, 946 (5th Cir. 2001). Whether evidence is material under Brady is a mixed question of law and fact. Summers v. Dretke, 431 F.3d 861 (5th Cir. 2005), citing Trevino v. Johnson, 168 F.3d 173, 185 (5th Cir. 1999).

Both of Graves' Brady claims were dismissed by the Texas courts as abuses of the writ, i.e. on procedural grounds.[3] Because these claims were not adjudicated on the merits in State court, a prerequisite for the applicability of 28 U.S.C. 2254(d), the heightened standard of review provided by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") does not apply. Id. at 946-47; Jones v. Jones, 163 F.3d 285, 299-300 (5th Cir. 1998); Fisher v. Texas, 169 F.3d 295, 299-300 (5th Cir. 1999), citing Larry W. Yackle, A Primer on the New Habeas Corpus Statute, 44 BUFF. L. REV. 381, 420-21 & n. 129 (1996)(stating that state court decision that claim was procedurally barred cannot be adjudication on the merits, for purposes of AEDPA).

III.

---

[3] In our decisions granting COA, we concluded that Graves had established cause for the procedural default because the state did not disclose the statements until after Graves filed his initial habeas petition. See Graves I, 351 F.3d at 154; Graves II, 351 F.3d at 158. Graves' petition was remanded to the federal district court for an evidentiary hearing and a decision on the merits of his Brady claims, from which Graves now appeals.

In Brady v Maryland, 373 U.S. 83, 87 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles v. Whitley, 514 U.S. 419, 433 (1995). Brady applies equally to evidence relevant to the credibility of a key witness in the state's case against a defendant. Giglio v. United States, 405 U.S. 150 (1972).

The Kyles decision emphasizes four aspects of materiality. First, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant)." 514 U.S. at 434. The question is not whether the defendant would have received a different verdict with the disclosed evidence, but "whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. A "reasonable probability of a different result" is shown when the suppression "undermines confidence in the outcome of the trial." Id.

Second, the materiality test is not a test of the sufficiency of the evidence. The defendant need not demonstrate that after discounting the inculpatory evidence by the undisclosed evidence that there would not have been enough evidence to sustain the conviction. Rather, a Brady violation is established by showing "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 435. Third, harmless error analysis does not apply. Id, Fourth, "materiality to be stressed here is its definition in terms of suppressed evidence considered collectively, not item by item." Id. at 436.

Graves bases his Brady claims on two suppressed statements the state admits Carter made on the evening before Carter testified at Graves' trial - first, that Carter committed the crimes alone, and second, that Carter's wife Cookie was an active participant in the murders.

No one disputes that Carter was the state's star witness. Graves made no self-incriminating statements to the police before his trial. He testified before the grand jury denying all involvement and explaining his whereabouts on the night of the murders. The only potentially incriminating statements allegedly made by Graves were heard over the jailhouse intercom system. The persons reporting these statements were effectively cross-examined on the reliability of the intercom system, their ability

to recognize Graves' voice since his cell could not be seen from their listening post, and their failure to make contemporaneous reports of the comments.

The only physical evidence tied to Graves that was marginally linked to the crimes was a switchblade knife brought forward by Graves' former boss that was identical to one that he had given to Graves as a gift. The medical examiner testified that the knife wounds on the victims were consistent with that knife **or** a knife with a similar blade. Graves' medical expert testified that a wide range of knives with similar dimensions to the switchblade were also consistent with the victims' wounds including holes in skull caps of some of the victims. None of the murder weapons were recovered. Thus, it is obvious from the record that the state relied on Carter's testimony to achieve Graves' conviction. It is in this context that the materiality of the suppressed statements must be examined.

**a.    The suppressed statement by Carter that he committed the crimes alone.**

The district court found that Graves was not aware of Carter's statement that he committed the crime by himself but found that the statement was not material.[4] Our original assessment of this statement was that it "was extremely favorable

_____

[4] District Attorney Sebesta contradicted Graves' counsel and testified at the habeas hearing that he told Graves' defense counsel Garvie of this statement outside the courtroom the morning after Carter made the statement. The district court did not find Sebesta credible on this point.

to Graves and would have provided powerful ammunition for counsel to use in cross-examining Carter." Graves I, 351 F.3d at 155. Although we did not have a completely accurate version of the events surrounding the statement at the time of our original opinion, under the facts as found by the district court on remand we reach the same conclusion.

Carter's statement that he acted alone in committing the murders is particularly significant because it was the first statement Carter made that implicated himself without also implicating Graves. The only other statement Carter made pre-trial exculpating Graves was before the grand jury. In that statement Carter claimed that neither he nor Graves was involved in the murders. At trial the state recognized that its case depended on the credibility of Carter and the prosecutor emphasized Carter's consistency in his various statements in naming Graves as an accomplice. In Carter's grand jury testimony Carter testified that he only gave Graves' name to investigators because he was coerced.[5] The prosecutor explained Carter's grand

---

[5] Before the grand jury, Carter testified as follows:
I couldn't harm anybody, but during interrogation, between seven and eight hours or so, I was told that they got enough evidence on me to give me the death penalty. I know I haven't done anything wrong. I know I wasn't in Somerville like they say I was. They say they know that I didn't do it, but I know who did it and they wanted me to give a name so I tried to tell them that I don't know anybody.
And by being pressured, being hurt, confused and didn't know what to think, I said Anthony Graves off the top of my head.

jury testimony by pointing out that Carter's testimony, that neither he nor Graves was involved, followed threats by Graves.[6] Carter's suppressed mid-trial statement exculpating Graves was not coerced and would have undercut the state's argument that Carter did not implicate Graves before the grand jury because Graves threatened him. The state's case depended on the jury accepting Carter's testimony. Given the number of inconsistent statements Carter had given, the state faced a difficult job of persuading the jury that Carter was a credible witness, even without the suppressed statement. Had the defense been able to cross-examine Carter on the suppressed statement, this may well have swayed one or more jurors to reject Carter's trial version of the events.

Perhaps even more egregious than District Attorney Sebesta's failure to disclose Carter's most recent statement is his deliberate trial tactic of eliciting testimony from Carter and the chief investigating officer, Ranger Coffman, that the D.A. knew was false and designed affirmatively to lead the jury to

---

[6] After eliciting testimony from Carter that Graves had threatened him physically and verbally while they were housed in the Burleson County Jail, the following exchange took place between Sebesta and Carter as Carter testified at Graves' trial:

Sebesta: What did you do when you went to the Burleson County grand jury?
Carter: Lied.
Sebesta: Why did you lie?
Carter: Because I was afraid.
Sebesta: How did you go about lying to them?
Carter: Saying that I made up the whole story, that it didn't take place.

believe that Carter made no additional statement tending to exculpate Graves. District Attorney Sebesta asked Carter to confirm that, with the exception of his grand jury testimony where he denied everything, he had always implicated Graves as being with him in committing the murders. Carter answered in the affirmative. Sebesta also asked Ranger Coffman, after Carter testified, to confirm that all of Carter's statements except the grand jury testimony implicated Graves. Sebesta also confirmed through Ranger Coffman that he understood his obligation to bring to the prosecutor's attention any evidence favorable to the defense. Although there is no factual finding regarding whether Ranger Coffman knew of Carter's statement that he committed the crimes alone, Sebesta clearly knew of the statement and used Ranger Coffman as well as Carter to present a picture of Carter's consistency in naming Graves that Sebesta clearly knew was false.

**b.    The suppressed statement by Carter that Cookie was an active participant in the murders.**

The state stipulated that Carter told Sebesta, "Yes, Cookie was there; yes Cookie had the hammer." This statement was also made the night before Carter testified in Graves' trial. Sebesta did not inform Graves' counsel of this statement. He did disclose to the court and counsel that Carter had failed a polygraph regarding Cookie's involvement.[7] The district court

---

[7] Sebesta made the following statement: "There is something I need to put on the record from a [sic] exculpatory standpoint. It cannot be used, but last night at 8:30 Mr. Carter took a polygraph and the basic question involved his wife, Theresa. It

found that after hearing about the polygraph, Graves did not exercise due diligence to discover the substance of the statement.  The district court also found that the statement was not exculpatory because it did not exculpate Graves.  Rather it was consistent with the state's three person theory, that the crime was committed by Carter, Cookie and Graves.  We disagree on all points.

**Due Diligence?**

The district court found that Sebesta's in-court statement "was not so vague in light of the surrounding circumstances that they should not have inquired about it further."  However, Sebesta's statement did not reveal or even imply that Carter gave a statement affirmatively naming Cookie as an active participant in the murders.  The defense had specifically requested any information related to any party, other than Graves and Carter, who the state alleged was involved in the crime.  They had no evidence that Cookie was involved in the crime and viewed her indictment as a tool to get Carter to testify.  This assumption was confirmed by Sebesta's discovery response.  Sebesta's response to the defense's discovery request was that "there were some names that were given" to the State, but that "[t]hey're not necessarily parties to the crime but they are people who may have - may possibly have some information on those."  Sebesta's

shows deception on that polygraph examination.  But, obviously, we can't go into polygraphs here, but I think Counsel is certainly entitled to know that."

questioning of Carter at Graves' trial about Cookie's involvement also reinforced defense counsel's belief that she was involved, if at all, after the crimes were committed.  In Sebesta's questioning of Carter, Sebesta asked Carter to confirm their agreement that he would not ask any questions about his wife and to confirm that he had "not asked [him] any question about what she may or may not know about it."  When the defense cross-examined Carter, they asked about Cookie's whereabouts and who possessed the hammer.  Carter's testimony was obviously different than the statement he gave Sebesta the previous night that Cookie was there and Cookie had the hammer.

We disagree with the district court's conclusion that the defense did not exercise due diligence to discover the statement regarding Cookie's involvement in the crimes.  Graves' counsel had specifically requested the information disclosed in the statement.  We view Sebesta's statement regarding the polygraph, his discovery responses and questioning of Carter as misleading and a deliberate attempt to avoid disclosure of evidence of Cookie's direct involvement.  At a minimum, Sebesta's minimal disclosure was insufficient to put the defense on notice to inquire further, particularly in light of the state's discovery disclosure.

**Exculpatory?**

Graves next challenges the district court's conclusion that the statement regarding Cookie's involvement is not exculpatory

because the statement implicated Graves as well.[8]  The district court found that the statement is not exculpatory because it implicated Graves based on the government's three person theory. It also found that the statement would have contradicted the testimony of one of Graves' witnesses, Tametra Ray, who testified that Cookie was home at the time of the murders.  Again, we disagree.

The statement regarding Cookie's direct involvement in the crime is exculpatory for several reasons.  First, each party's theory about how many people were actively involved in the crime is just a theory based on the number of people killed and the number of weapons used.  The defense had submitted that two people were probably involved and had specifically requested any information related to any party, other than Graves and Carter, who the state alleged was involved in the crime.  Although Cookie had been indicted, the defense viewed the indictment as a tool to pressure Carter into testifying.  As we noted in our prior opinion, "if Graves had been furnished with Carter's statement, it could have provided him with an argument that those two persons were Carter and his wife rather than Carter and Graves."

---

[8]  Graves also argues that the district court erred in concluding that in this suppressed statement, Carter named both Cookie and Graves as participants in the murders. Graves views this suppressed statement as one in which Carter named only his wife Cookie as a participant in the crimes.  The district court found that after the polygraph examination Carter admitted that Cookie was involved in the murders with him and Graves.  Based on our review of the record of the habeas hearing, that factual finding is not clearly erroneous.

Graves II, 351 F.3d at 159.  Also, Carter's statement, placing
Cookie directly at the scene and actively involved in the
murders, puts his deal with the state to testify only on the
condition that he not be questioned about Cookie's involvement in
a different light.  It provides a stronger argument to Graves
that Carter was lying about Graves involvement to save Cookie.

The district court did not reach the issue of materiality of
the statement.  That issue will be discussed in the following
section regarding the effect of the two statements considered
together.

### c.    The statements considered together?

The sole remaining issue under Graves' Brady claim is
whether, considered together, the two statements - Carter's claim
that he did it himself and Carter's statement directly
implicating his wife Cookie in the murders - are material.  We
conclude that they are.  If both statements had been timely
furnished to Graves, he could have persuasively argued that (1)
the murders were committed by Carter alone or by Carter and
Cookie; and (2) Carter's plan from the beginning was to exonerate
Cookie, but a story that he acted alone was not believable, so he
implicated Graves so the prosecution would accept his story and
decline to prosecute Cookie.

The state argues that the combined statements are not
material because they are inconsistent and could have been
damaging to Graves if the jury believed that the most credible

account of the murders involved three killers, Carter, Cookie and Graves. The problem with the state's argument is that it analyzes the significance of the suppressed evidence against a backdrop of how the defense presented its case at trial without the suppressed statements. If the two statements had been revealed, the defense's approach could have been much different (as set forth above) and probably highly effective.

Case law from the Supreme Court is supportive of a finding of materiality on these facts - particularly because the case against Graves rests almost entirely on Carter's testimony and because the state presented testimony inconsistent with the two suppressed statements. In Giglio v. United States, 405 U.S. 150 (1972), the Supreme Court reversed the defendant's judgment of conviction and remanded for a new trial because the prosecutor failed to disclose a promise of leniency to a key witness. The court concluded that the suppression affected the co-conspirator's credibility which was an important issue in the case and therefore material.

In Banks v. Dretke, 540 U.S. 668 (2004), the Supreme Court reversed this court's denial of COA to the defendant on his Brady claim. The state withheld evidence that would have allowed defendant to show that two essential prosecution witnesses had been coached by police and prosecutors before they testified and also that they were paid informants. In addition, prosecutors allowed testimony that they were not coached to stand uncorrected

at trial. In <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995), the defendant's conviction was reversed and remanded for a new trial. The prosecution had suppressed statements of key witnesses and an informant who were not called to testify resulting in a <u>Brady</u> violation because their statements had significant impeachment value. Graves' case presents a cumulation of the elements found violative of a defendant's right to exculpatory evidence in the above cases.

IV.

Because the state suppressed two statements of Carter, its most important witness that were inconsistent with Carter's trial testimony, and then presented false, misleading testimony at trial that was inconsistent with the suppressed facts, we have no trouble concluding that the suppressed statements are material. Carter made several inconsistent statements throughout the investigation and pre-trial period. In some he denied all involvement, in some he implicated himself and Graves, and then, just before he testified against Graves, he gave the statements at issue in this appeal accepting full responsibility as the sole murderer and another statement placing his wife Cookie as an active participant in the murders. If the defense had known about the statement placing Cookie at the scene and given Carter's continuing condition that he would only testify if he were not asked about Cookie's involvement, the defense could have explained every statement implicating Graves as a means of

protecting Cookie.  As indicated above, these statements are particularly important in this case because Graves' conviction rests almost entirely on Carter's testimony and there is no direct evidence linking him with Carter or with the murder scene other than Carter's testimony.  In addition, Carter's statement that he committed the crimes alone is important as the only statement he made exculpating Graves while implicating himself.  The combination of these facts leads us to conclude "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  Kyles, 314 U.S. at 435.  Stated differently, disclosure of the statements "would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense."  Id. at 441.

For the foregoing reasons, the judgment of the District Court is reversed and the case is remanded with instructions to grant the writ of habeas corpus unless the state proceeds to retry petitioner within a reasonable time.

WRIT GRANTED.  REMANDED.