Filed 1/19/21  P. v. Wilson CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>            Plaintiff and Respondent,<br><br>v.<br><br>ZURI A. WILSON,<br><br>            Defendant and Appellant. | A157230<br><br><br>(San Francisco City and County Super. Ct. Nos. 13028170 / 225664) |

After two assailants shot and killed a man outside a public housing project in San Francisco, Zuri A. Wilson was convicted of the murder (Pen. Code, § 187, subd. (a)) and sentenced to life in prison without parole.  In this appeal, he contends that the trial court erred in denying his motion to suppress evidence because the police violated his Fourth Amendment rights when they conducted a search of his phone using a cell site simulator.  He also asserts that the court erred in denying his motion for a mistrial after the prosecution withheld exculpatory evidence until the fifth week of trial, in violation of the prosecution's obligations under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).  Although we reject Wilson's Fourth Amendment claim, we agree that the prosecution violated his due process rights by failing to timely disclose key evidence.  We therefore reverse.

1

## BACKGROUND

The victim, Shawnte Otis, was killed as he was retrieving something from his rental car. His aunt, Demetria B., who was with him at the time, saw only one of the shooters: a light-skinned black male, 5'9" to 6'1" tall, wearing a red baseball cap, a black hoodie, black clothing, and a black mask. A surveillance camera recorded video of the shooting, but it was not clear enough to identify the faces of the shooters. Based on the physical evidence, police determined that the shooters were using a nine-millimeter pistol and a .45-caliber handgun with RWS brand ammunition.

Shortly after the murder, police spoke with Yvette M., who lived on a street adjacent to the housing project. Just after hearing the shots, she saw two men run down the hill and get into a charcoal-colored Nissan that was parked directly in front of her vehicle, down the street from her house, and drive away. They were wearing jeans and hoodies, and one of the men had a black backpack.

By reviewing surveillance video, police identified a gray Nissan Altima being driven by Wilson near the crime scene about two hours before the shooting. A female friend had rented the vehicle for a week at Wilson's behest. In the video, shortly after Wilson drove past, the curtains and door closed in an abandoned apartment where the police believed the shooters waited before the homicide.

Police obtained cell phone records for Wilson, which indicated that his cell phone had connected to cell towers within one-half to three-quarters of a mile from the housing project on the afternoon of the shooting and left the vicinity after the shooting.

Police also conducted searches of several addresses they believed to be associated with Wilson. At an apartment on Montoya Street in San Pablo, in

2

the front closet, they found the nine-millimeter pistol used in the murder and a green backpack with binoculars and walkie-talkies, as well as clothing and other items.  In a bedroom they found a black face mask, black beanie, other black clothing, a hard gun case, a soft rifle case, and metal letters purportedly spelling out Z-U-R-I.  The apartment had beds in two separate rooms and more than one closet, and the police seized a lease, bills, and other documents reflecting the names of several individuals other than Wilson.  In a subsequent search of the apartment, police found some .45-caliber RWS brand bullets.

The police arrested Wilson, a light-skinned black male who is 5'7" tall.  At trial, Wilson argued that the prosecution's case was based entirely on circumstantial evidence that failed to establish that he was one of the shooters.  There was no DNA or other physical evidence connecting him to the crime, and the police never identified the second shooter.  Wilson asserted that he was a gun dealer and drug dealer and that his text messages showed that he was in the area to sell drugs that afternoon.  He argued that Yvette M.'s account was unreliable given her testimony that she was an alcoholic who had been drinking that day.

Although Wilson did not dispute that he sometimes stayed at the Montoya Street apartment, he pointed to evidence that other individuals had access to the apartment, including an associate of his named Vernon C.  Further, DNA testing excluded Wilson as a source of DNA found on the nine-millimeter murder weapon and on the RWS ammunition.  Instead, Vernon C.'s DNA was found on the murder weapon, and DNA for an unknown female was found on the RWS cartridges.

3

## DISCUSSION

### A.

Wilson contends that the trial court erred in denying his motion to suppress evidence resulting from the police department's use of a cell site simulator to locate his cell phone and, with it, the Montoya Street apartment. The People concede that the use of the cell site simulator was a search that required a warrant. (See, e.g., *United States v. Ellis* (N.D. Cal. 2017) 270 F.Supp.3d 1134, 1146 (*Ellis*).) However, they argue that the evidence should not be suppressed because the good faith exception to the exclusionary rule applies here. On de novo review, we agree and affirm the trial court's denial. (See *People v. Mateljan* (2005) 129 Cal.App.4th 367, 373 [in reviewing denial of a motion to suppress, " ' we give deference to the trial court's factual determinations[,] [but] we independently decide the legal effect of such determinations ' "].)

### 1.

Under the Fourth Amendment to the United States Constitution, law enforcement authorities must obtain a judicial warrant before conducting a search or seizure unless an exception to the warrant requirement applies. (See, e.g., *People v. Williams* (1999) 20 Cal.4th 119, 125-126.) The warrant must "particularly describ[e] the place to be searched, and the persons or things to be seized." (U.S. Const., 4th Amend.) When applicable, the exclusionary rule prohibits the use of evidence seized in violation of the Fourth Amendment. (*People v. Pearl* (2009) 172 Cal.App.4th 1280, 1292 (*Pearl*).) When the police obtain evidence as a result of an unlawful seizure, suppression "is not an automatic consequence." (*Herring v. United States* (2009) 555 U.S. 135, 137 (*Herring*).) Under the good faith exception to the exclusionary rule, "evidence will not be suppressed if the police officer

4

had an objectively reasonable belief the search or seizure was constitutionally permissible." (*Pearl*, *supra*, 172 Cal.App.4th at p. 1292; see also *United States v. Leon* (1984) 468 U.S. 897, 922 (*Leon*) [recognizing exception to exclusionary rule for "evidence obtained [by the police] in objectively reasonable reliance on a subsequently invalidated search warrant"].) The burden is on the People to establish that the exception applies. (*Pearl*, *supra*, 172 Cal.App.4th at p. 1293.)

**2.**

Here, the police obtained a search warrant directing the telephone company to provide "pen register" and "trap-and-trace" data associated with Wilson's cell phone for thirty days. As explained in the affidavit supporting the warrant, "[a] 'Pen Register' allows a telephone utility to capture the telephone numbers dialed out by the Subject Telephone Number; a 'Trap-and-Trace' device allows a telephone utility to capture the telephone numbers of telephones that call the Subject Telephone Number." The warrant directed the telephone company to provide specified information relating to Wilson's telephone number: "Base Station (Cell Antennae) configuration data associated with the network access events of the Subject Telephone Number, including geographic location estimates, cell site locations, signal strength and directional bearing associated with the network access events for Subject Telephone Number, . . . via the facilities, technical equipment[] and software of the San Francisco Police Department." The warrant also authorized "[g]eographic location estimates of the Subject Telephone Number device, derived from network signaling and cell site configuration information and analyzed via technical equipment and software of the San Francisco Police Department." In addition, the warrant provided that "Peace Officers . . . are authorized to conduct remote monitoring of the Subject Telephone Number

5

device, day or night, including those signals produced in public, or locations not open to public or visual surveillance.  If necessary, searching officers are authorized to employ the use of outside experts, acting under the direct control of investigating officers, to access and preserve any electronic data."

Although the warrant never mentioned the use of a cell site simulator, the police used one to identify the apartment building where Wilson was located.  As its name suggests, a cell site simulator is a mobile device that locates nearby cell phones by simulating the telephone company's cell tower, such that nearby cell phones transmit signals to the simulator rather than to the cell tower.  (See, e.g., *United States v. Lambis* (S.D.N.Y. 2016) 197 F.Supp.3d 606, 609 (*Lambis*).)  Here, the officer operating the cell site stimulator testified that information from the telephone company allowed the police to identify the general geographic area where Wilson's phone was located, based on the location of the cell tower to which the phone was connecting.  The officer then drove with the cell site simulator through that area "to try to find a signal for [Wilson's] phone."  The device indicated when the officer was getting closer to Wilson's phone and allowed him to determine that Wilson was likely located in a particular building.

### 3.

When the police used the cell site simulator to locate Wilson's phone in October 2013, the state of the law on cell site simulators was less clear than it is today.  The Supreme Court had considered another type of sense-enhancing technology in *Kyllo v. United States* (2001) 533 U.S. 27, which held that the use of a thermal imaging device to detect levels of heat within a private home constituted a search within the meaning of the Fourth Amendment.  (*Id*., at p. 34.)  Subsequently, *United States v. Jones* (2012) 565 U.S. 400, 404-405 (*Jones*), held that "the Government's installation of a GPS

6

device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.' " (*Ibid.*; see also *ibid.* [emphasizing the fact that in attaching the GPS device, "[t]he Government physically occupied private property for the purpose of obtaining information"]. The few cases specifically addressing the use of cell cite simulators resulted in differing opinions. (Compare *In re Application of U.S. of Am. for an Order Authorizing Use of a Cellular Tel. Digital Analyzer* (C.D. Cal. 1995) 885 F.Supp.197, 199-200 ["no court order is required to use a cellular telephone digital analyzer"]; with *In re Application of U.S. of Am. for an Order Authorizing the Installation & Use of a Pen Register & Trap & Trace Device* (S.D. Tex. 2012) 890 F.Supp.2d 747, 748 [denying application for order authorizing use of stingray as a pen register in the absence of authority that pen register statute, rather than warrant requirement, applies to stingrays, and noting that "there is scant case law addressing the equipment"]; see also *Ellis*, *supra*, 270 F. Supp. 3d at p. 1155 [stating that at the time cell site simulator in that case was used in January 2013, "there was no controlling authority as to whether its use constituted a search requiring issuance of a warrant"].)

The United States Supreme Court did not consider the Fourth Amendment implications of cell site location information until 2018, in *Carpenter v. United States* (2018) 138 S.Ct. 2206, which held that the government must get a search warrant to obtain cell site location information from a cell phone company. (*Id.* at p. 2221.) In so holding, the court acknowledged that "[t]his sort of digital data—personal location information maintained by a third party—does not fit neatly under existing precedents." (*Id.* at p. 2214.) Thus, in 2013, it would not have been unreasonable for the police to conclude that a warrant was not required to authorize the use of a cell site simulator.

7

**4.**

The People argue that even assuming the warrant they obtained did not authorize the search, the good faith exception applies because the officers reasonably believed that the warrant authorized them to use a cell site simulator to obtain location information concerning Wilson's cell phone. Wilson correctly asserts that the warrant here purported to authorize use of a pen register and trap-and-trace device by the telephone company to gather information concerning Wilson's telephone number, without mentioning a cell site simulator. Although it is a close question, we agree with the People that the police officers' cell site simulator search was objectively reasonable, particularly given the ambiguity in the case law in 2013 as to whether a warrant was required at all.

The officers could have reasonably believed that the language of the warrant described and authorized with sufficient particularity the search to be undertaken. The warrant authorized the police department to use its "technical equipment" to obtain "geographic location estimates" of Wilson's telephone. In conjunction with the warrant's authorization of "remote monitoring" of Wilson's telephone and "signals produced in . . . locations not open to public or visual surveillance," we cannot say that the officers' belief that the cell site simulator search was authorized by the warrant was objectively unreasonable. (See *Ellis*, *supra*, 270 F.Supp.3d at p. 1156 [applying good faith exception to cell site simulator search where pen register warrant obtained by police made clear that purpose of the search was to locate defendant's "cell phone with information about 'cell site and/or location sites' "].) Wilson's reliance on cases in which the language of the warrant or order was more limited is thus unavailing. (See, e.g., *Lambis*, *supra*, 197 F.Supp.3d at p. 611 ["Here, the use of the cell-site simulator to obtain more

8

precise information about the target phone's location was not contemplated by the original warrant application."]; *State v. Sylvestre* (Fla.Ct.App 2018) 254 So.3d 986, 992 [order "required the service provider to disclose information in its possession to the . . . Sherriff's Office. It did not authorize action by the State."]; *Tracey v. State* (Fla. 2014) 152 So.3d 504, 507 [the "application did not seek authority . . . to track the location of [the defendant's] cell phone in . . . real time; and the order did not ask for access to real time cell site location information"].)[1]

Wilson contends that the police did not act in good faith because they actively concealed their intent to use the cell site simulator from the judge who issued the warrant, apparently due to an agreement between the San Francisco Police Department and the federal government not to disclose details of the technology. We agree that a nondisclosure agreement cannot justify the deliberate omission of relevant information from a warrant application. However, here the police communicated to the judge that they intended to use the police department's technical equipment to conduct remote monitoring and to obtain "geographic location estimates" of Wilson's phone. The officer who authored the warrant request believed "the generic reference to geographic location would encompass [the cell site simulator] device without having to name all [the] different technologies [he] wanted to use." Although it did not name the technology, the affidavit in support of the warrant explained that "[by] identifying the events when the mobile handset acquires the [cell phone service] network, indicating that the device is active and able to receive or transmit a telephone call, and on which 'base station',

---

[1] *State v. Andrews* (Md.Ct.App. 2016) 227 Md.App.350, also cited by Wilson, is inapposite because unlike in the instant case, the pen register / trap-and-trace order obtained by the police did not require a showing of probable cause. (*Id.* at pp. 410, 412.)

or cell antennae such an event occurred, an estimation can be made as to the vicinity where the Subject Telephone Number is acquiring network service. These network access events, along with the base station configuration data, can be analyzed via technical equipment and software of the San Francisco Police Department, in order to estimate the immediate vicinity of the Subject Telephone Number Device." The language of the warrant and affidavit thus communicated, in generic terms, what the police intended to do. Accordingly, this was not a situation in which the "judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false" (*Leon*, *supra*, 468 U.S. at p. 923), or in which the police acted in "deliberate" disregard of Fourth Amendment rights. (*Herring*, *supra*, 555 U.S. at p. 144.)

Wilson also argues that the good faith exception is inapplicable unless the officers rely on binding appellate precedent that is subsequently overruled, citing *Davis v. United States* (2011) 564 U.S. 229, 241. However, while that is one situation in which the good faith exception may apply, it is not the only one. (See, e.g., *Leon*, *supra*, 468 U.S. at p. 926 [applying good faith exception where the "evidence [in the affidavit was] sufficient to create disagreement among . . . judges as to the existence of probable cause"]; see also *Ellis*, *supra*, 270 F.Supp.3d at p. 1157 [applying good faith exception to cell site simulator search].)

In addition, Wilson asserts that the officers' reliance on the warrant was objectively unreasonable because they should have known that a warrant was required to authorize a search of a private home. However, as discussed, the warrant allowed the police to use their technical equipment to conduct remote monitoring of Wilson's cell phone, including of "signals produced in . . . locations not open to public or visual surveillance."

*United States v. Karo* (1984) 468 U.S. 705 (*Karo*) supports the conclusion that the officers' reliance on the warrant was reasonable. *Karo* held that the monitoring of a tracking device (called a beeper) "in a private residence, a location not open to visual surveillance, violates the Fourth Amendment" absent a warrant. (*Id.* at pp. 714-715.) The court recognized that when law enforcement is using tracking technology to locate a subject, it may sometimes be "impossible to describe the 'place' to be searched, because the location of the place is precisely what is sought to be discovered through the search." (*Id.* at p. 718.) Even so, the court emphasized that "it will still be possible to describe the object into which the beeper is to be placed, the circumstances that led agents to wish to install the beeper, and the length of time for which beeper surveillance is requested. In our view, this information will suffice to permit issuance of a warrant authorizing beeper installation and surveillance." (*Ibid.*)

Similarly, here it was reasonable for the officers to conclude that the language of the warrant and affidavit was sufficient in specifying Wilson and his phone number as the targets of the search, the circumstances that led police to suspect Wilson, and the applicable time frame of the search. (See also *United States v. Tutis* (D.N.J. 2016) 216 F.Supp.3d 467, 480-481 [rejecting argument that cell site simulator warrant was not sufficiently particular where it did not expressly authorize a search of the defendant's home, and concluding the warrant's statement that the device would be used at different locations where the defendant was located was sufficient.)

In sum, although the warrant and affidavit would not pass muster today, we conclude that in light of the lack of clarity in the case law in 2013, and the generic language in the warrant encompassing the cell site simulator

11

search, the police reasonably believed that their search was constitutionally permissible.

**B.**

Wilson asserts that the trial court erred in denying his motion for a mistrial based on the prosecution's failure to timely comply with its obligation to disclose evidence favorable to the defense under *Brady*. (See *Brady*, *supra*, 373 U.S. 83.) After conducting an independent review (*People v. Stewart* (2020) 55 Cal.App.5th 755, 770 (*Stewart*)), we agree.

**1.**

*Brady* held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment[.]" (*Brady*, *supra*, 373 U.S. at p. 87; see also *Stewart*, *supra*, 55 Cal.App.5th at p. 777 [the " 'touchstone of materiality is a "reasonable probability" of a different result,' " and " '[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence' "].) Where, as here, the issue is whether delayed disclosure constitutes *Brady* error, " ' the applicable test is whether defense counsel was "prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case." ' " (*People v. Mora & Rangel* (2018) 5 Cal.5th 442, 467 (*Mora & Rangel*); see also *United States v. Bagley* (1985) 473 U.S. 667, 682-683 (*Bagley*) [because prosecution's failure to disclose favorable evidence may cause the defense to "abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued," "the reviewing court may consider directly any adverse effect that the prosecutor's failure . . . might have had on the preparation or

presentation of the defendant's case"]; *In re Bacigalupo* (2012) 55 Cal.4th 312, 334 (*Bacigalupo*) ["In deciding whether evidence not disclosed to the defense was material . . . , we consider how the nondisclosure affected the defense investigation and trial strategy."].)

**2.**

As the People concede, until halfway through the trial, the prosecution failed to disclose the final eight pages of the lead investigating officer's chronological report, which details the steps he took to investigate the crime. The prosecution did not disclose the updated report until 2019, even though the final entry in the file dates back to 2014, the officer provided the material to the prosecution in 2016, and the defense repeatedly requested an updated version. Before we assess its impact, we first summarize the new evidence.

**Otis's Feud with Quinten M.**

Wilson points to entries in the chronological report indicating that another individual who had a motive to kill Otis had previously hired two men to murder Otis's family member in San Francisco. Otis had been involved in a "feud" with someone named Quinten M. According to police, Otis and an associate shot and killed Quinten M.'s cousin about five months before Otis was murdered. Shortly after Quinten M.'s cousin was killed, Otis's cousin was murdered in San Francisco. The chronological report listed the name of Otis's murdered cousin as well as the address in San Francisco where the homicide occurred. A San Francisco police sergeant had reason to believe that Quinten M. hired two men, Stephone B. and David H., to kill Otis's cousin. The police believed two other murders resulted from the same feud.

According to police testimony, they ultimately ruled out Stephone B. and David H. as suspects because the cell phone numbers that police believed

13

they were using five months earlier were not identified as being in the vicinity at the time of the murder. However, the investigating officer testified that he had "no way of knowing" whether the two men had changed phones by the time of the murder, and "it would be impossible to determine whether they were standing there [at the shooting] and their cellular phone was off." By the time of the trial in 2019, David H. was deceased.

**Jacque B.**

The chronological report also contained information concerning the police investigation of a suspect named Jacque B., who matched Demetria B.'s sole description of the shooter and was associated with Quinten M. Defense counsel was aware that police had tested the nine-millimeter pistol for DNA from someone by this name but did not know how he was related to the case. A confidential informant told police that Jacque B. was the second shooter with Wilson. The police also received information that Jacque B. was known to use a nine-millimeter pistol with an extended magazine. The chronological report stated: "It should be noted that Jacque B[.] fits the description of the 2nd shooter, which is unique as the 2nd shooter was tall, skinny, and a light skinned [black male]. The 2nd shooter also used a 9mm pistol with an extended magazine." The lead police investigator testified that he ultimately ruled out Jacque B. as a potential suspect, but he did not explain the basis of that conclusion.

**The Leaseholder of the Montoya Street Apartment**

The chronological report also contained information concerning Kenneth L., one of two tenants named on the lease for the Montoya Street apartment. The defense had been unsuccessful in locating him. According to the chronological report, the police located Kenneth L. at an address in Richmond, and he told them that he had sublet the Montoya Street

14

apartment to a woman who provided access to Wilson, telling police her name.

**Eyewitness Description of Shooter**

The new evidence included a statement from an eyewitness who told police that the shooter she saw was a 5'7" male with a dark complexion, a red bandanna face mask, all black baggy clothing, and a hooded jacket. She told police that she was able to see the complexion of the shooter because she could see the area above the bandanna, around the shooter's eyes. The defense examined her at a hearing after the delayed disclosure, but at that point (five years after her statement to police) she testified that she did not remember the shooting, and the defense did not call her as a witness at trial.

**Other Suspects**

The omitted pages of the chronological report also reported that Vernon C., whose DNA was found on the murder weapon, had met with several men at a motel two months after the shooting and that police seized guns from an individual named Steve H., whom they suspected of being one of the shooters or a lookout.

**3.**

We conclude that the evidence concerning Otis's feud with Quinten M., Jacque B., and Kenneth L. was both favorable and material.

With respect to the feud with Quinten M., as the People acknowledge, evidence that another team of shooters had a motive to kill the victim could certainly be favorable to Wilson. The People nonetheless assert that the information in the chronological report was not favorable because it was insufficient to allow the defense to introduce the evidence at trial under a third-party liability theory. (See *People v. Sandoval* (1992) 4 Cal.4th 155, 176 [" '[E]vidence of mere motive or opportunity to commit the crime in another

15

person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.' "].)

However, we must assess the *Brady* material "with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response" to the defendant's discovery request. (*Bagley, supra*, 473 U.S. at p. 683.) Here, the information in the chronological report was not limited to motive; it also indicated that Otis's cousin was murdered by two men in San Francisco just months before he himself was killed by two men in San Francisco. The information would have allowed the defense to discover the police reports and track down witnesses. In addition, it would have enabled the defense to investigate whether the modus operandi, location, physical descriptions of the men hired by Quinten M. or other circumstances of the cousin's murder provide circumstantial evidence that the same perpetrators were involved here. Because the defense could have used the information effectively to further its case, the material was favorable. (See *In re Pratt* (1999) 69 Cal.App.4th 1294, 1312 (*Pratt*) [" 'Evidence is "favorable" [under *Brady*] if it either helps the defendant or hurts the prosecution[.] ' "]; see also *Bagley, supra,* 473 U.S. at p. 676 [evidence is "evidence favorable to an accused, [citation], . . . [where] if disclosed and used effectively, it may make the difference between conviction and acquittal"].)

Similarly, the disclosure that Jacque B. was a potential suspect was favorable to the defense. Although the informant stated that Jacque B. was the second shooter "with" Wilson, the identification of a potential suspect whose associate (Quinten M.) had a motive to kill the victim would have

16

undermined the prosecution's case. Jacque B. was known to use the same kind of weapon as the nine-millimeter murder weapon, and given his height and skin color he was arguably a closer match to the lone eyewitness description presented at trial.

Further, while Jacque B.'s potential involvement did not necessarily rule out Wilson, it made it less likely that Wilson was one of the shooters. Once the shooter with the nine-millimeter pistol was accounted for, there was little pointing to Wilson as the second shooter: there was no physical description of the other shooter presented at trial; the .45-caliber handgun was never found, and the only evidence the prosecution had that specifically tied Wilson to the other gun were text messages indicating he was selling a .45-caliber pistol the day before the shooting and the fact that RWS brand cartridges were found in the Montoya Street apartment. In addition, while Wilson has a light complexion, the newly-disclosed eyewitness reported that the shooter she saw was "dark complected."

The information concerning leaseholder Kenneth L. was likewise favorable to Wilson. The prosecution's case depended heavily on convincing the jury that the nine-millimeter pistol, together with numerous other items found in the Montoya Street apartment, belonged to Wilson. The defense was unable to find witnesses to testify on the critical issue of access to the apartment, and instead relied on the names on the lease, bills, and other documents found at the apartment, and differing sizes of clothing found there, to argue that others had access. Interviewing Kenneth L. and the subtenant he identified may have allowed the defense to strengthen its theory that others had access and to present witnesses on this key issue. (*Cf. Pratt, supra*, 69 Cal.App.4th at p. 1319 [link between defendant and getaway

car was "not compelling" where there was "strong evidence" that defendant's "car was frequently used by other[s]".)

Further, we conclude that the delayed disclosure prejudiced Wilson by preventing him from using the material effectively in preparing and presenting his case. (*Mora & Rangel*, *supra*, 5 Cal.5th at p. 467; see *Wearry v. Cain* (2016) 136 S.Ct. 1002, 1007 (per curiam) (*Wearry*) [explaining that materiality of evidence wrongfully withheld under *Brady* must be evaluated cumulatively].) At trial, Wilson presented just three defense witnesses and did not put forward an affirmative theory of the crime, instead focusing on undermining the prosecution's circumstantial evidence. Had Wilson received timely disclosure of this information, the defense could have investigated the Quinten M. feud, as well as Jacque B.'s involvement, and may have presented a plausible alternative theory on the identity of the shooters, or relied on the information concerning these other potential suspects to attack the thoroughness of the investigation. (See *Bies v. Sheldon* (6th Cir. 2014) 775 F.3d 386, 400-401 (*Bies*).) Similarly, had the prosecution disclosed Kenneth L.'s address and statement years earlier, the defense would have interviewed him and his subtenant, and it could have presented witnesses to bolster its argument that, because several other individuals had access to the apartment, the prosecution failed to establish that the items found there belonged to Wilson. (See *Bacigalupo*, *supra*, 55 Cal.4th at p. 334 [finding *Brady* violation where timely disclosure of witness's statement would have "enhanced" defendant's theory by allowing defense to call her as a trial witness].)

However, by the time the prosecution disclosed the information in 2019, the prosecution had already presented 16 of its 19 witnesses, and it was too late for the defense to track down multiple leads and multiple individuals, at

18

least one of whom was dead, and reconfigure the defense's theory of the case midstream. When *Brady* material requiring further investigation is not disclosed until the "trial is under way, the opportunity to use it may be impaired" because "[t]he defense may be unable to divert resources from other initiatives and obligations that are or may seem more pressing." (*Leka v. Portuondo* (2d Cir. 2001) 257 F.3d 89, 101 (*Leka*).) Indeed, it took the police three months to locate Jacque B. in 2014. It is reasonably likely that the defense would have had difficulty locating him or his associates mid-trial five years later. Moreover, it can be "difficult . . . to assimilate new information, however favorable, when a trial already has been prepared on the basis of the best opportunities and choices then available." (*Ibid.*)

The People's reliance on *People v. Jenkins* (2000) 22 Cal.4th 900, 950 (*Jenkins*), is misplaced. *Jenkins* concerned a defendant's claim that he was prejudiced when the prosecution delayed its disclosure of evidence of inculpatory statements by the defendant until two months after the preliminary hearing, which was one and one-half years prior to trial. (*Jenkins, supra,* 22 Cal.4th at pp. 950-951.) In the course of rejecting the claim, the court explained that it is the defendant's burden to show that a continuance would not have cured any harm from the prosecution's failure to timely comply with the trial court's discovery order. (*Id.* at p. 950.) *Jenkins* is inapposite: "[t]he delay in disclosure did not implicate defendant's due process right" under *Brady* because the evidence in question was inculpatory. (*Id.* at p. 951.) Further, the defendant was not prejudiced because he "had ample time to investigate before trial." (*Ibid.*) In any event, given the quantity and nature of material at issue here, the prosecution's unexplained years-long delay in disclosure, and the clear impact on the defense's

19

investigation, preparation, and strategy, a continuance was no substitute for timely disclosure, and Wilson acted reasonably in requesting a mistrial.

Particularly in light of weaknesses in the prosecution's case, we conclude the belated evidence undermines confidence in the outcome of the trial. (See *United States v. Agurs* (1976) 427 U.S. 97, 113 ["[I]f the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt."]; see also *Wearry*, *supra*, 136 S.Ct. at p. 1006.) The prosecution's case was entirely circumstantial, failed to identify a second shooter, and lacked any explanation of Wilson's motive. It rested primarily on imprecise cell phone records, the identification of a car by an unreliable eyewitness, and the presence of the murder weapon and other items at an apartment with indicia that others beside Wilson had access.

The cell phone records were "consistent" with Wilson being at the scene of the crime, but they were also consistent with him being one-half to three-quarters of a mile away.

Yvette M., who claimed she saw the shooters drive away in a charcoal gray Nissan, testified that she was drinking that day, she was an alcoholic, and she would not trust her memory. When she was shown photos of a Nissan Sentra, Altima, and Maxima, she said they all looked the same to her. Although she told police she thought the car was a Nissan because she "saw the Nissan sign in the back," she also told the police the car was parked "[t]ight" in the space directly in front of her own vehicle. The defense presented evidence that based on how closely the car was parked to Yvette M.'s vehicle and the distance from her house, she would not have been able to see a Nissan marking on the rear of the car. In addition, surveillance video showed that another gray Nissan drove past the crime scene approximately

one hour before the shooting. A few dark gray Nissans and dozens of other dark gray cars drove by that afternoon.

The fact that police found the nine-millimeter murder weapon at the Montoya Street apartment was perhaps the most damaging evidence against Wilson. Police also found black clothing, a black mask, a green backpack containing walkie talkies and binoculars, as well as cartridges of the same brand as the .45-caliber casings found at the scene.

But although Wilson did not dispute that he had access to the apartment, it was also undisputed that his DNA was not found on the murder weapon. Instead, it was Vernon C.'s DNA on the nine-millimeter pistol, and the presence of Vernon C.'s medical bills at the apartment suggested he was living there. While the prosecution's witness testified that he did not see RWS brand ammunition in his crime lab "very often," he did see it "periodically," and he had "no idea" how much RWS ammunition was sold in the United States or in San Francisco and surrounding areas. The clothing—a black hoodie, pants, and beanie – is ubiquitous. Similarly, binoculars, walkie talkies, and backpacks can be used for many purposes unrelated to murder, including Wilson's drug and gun business. While the parties disputed whether the black mask was the same as the one seen in the surveillance video, the investigating officer testified he and his daughters had similar masks for snowboarding.

The prosecution also relied on other equivocal evidence, including evidence that Wilson's cell phone records indicated that about 11 minutes after the shooting, he had left the vicinity; he attempted to flee before he was arrested; and in calls made from jail after his arrest, Wilson asked associates, including Vernon C., to retrieve unknown items for him, referring to the items in code. However, this evidence – like much of the prosecution's case –

21

was also consistent with Wilson being a dealer of guns and drugs who did not wish to be detained by police.

At the end of the day, the critical questions were the identity of the shooters and whether the nine-millimeter murder weapon belonged to Wilson. The evidence withheld by the prosecution went to the heart of these questions. (Cf. *Bies*, *supra*, 775 F.3d at pp. 399-400 ["Given the strength of the exculpatory evidence that was suppressed by the State, and the relative weakness of the State's case . . . , the failure to disclose the evidence unquestionably put the whole case in such a different light as to undermine confidence in the verdict."]; *Graves v. Dretke* (5th Cir. 2006) 442 F.3d 334, 343-344 [finding *Brady* violation where "there [was] no direct evidence" against the defendant and had defense known about the other suspect, the defense could have "persuasively argued" that the other suspect committed the murder].) We hold that the defense was prejudiced by the prosecution's failure to timely disclose the information. The trial court thus erred in denying Wilson's motion for a new trial.

We need not reach Wilson's remaining claims.

### DISPOSITION

The judgment is reversed, and the case is remanded for further proceedings.

_____
BURNS, J.

We concur:

_____
NEEDHAM, ACTING P.J.

_____
SELIGMAN, J.*

A157230

---

* Judge of the Superior Court of Alameda County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.